TEXAS & P. RY. CO. v. SHERER. *
(No. 8264.)

(Court of Civil Appeals of Texas. Ft. Worth. Jan. 15, 1916. On Motion for Rehearing, Feb. 19, 1916.)

1. REMOVAL OF CAUSES ☞3 — RAILROADS — ACTION FOR INJURIES—STATUTE.

Under U. S. Comp. St. 1913, § 8662, providing that the jurisdiction of the courts of the United States under the Employers' Liability Act shall be concurrent with that of the courts of the several states, and no case arising under the act and brought in any state court of competent jurisdiction shall be removed to any court of the United States, an employé's suit for injuries against a railroad incorporated by act of Congress was not removable from the state to the federal court on the ground that it involved a question of law arising under a federal statute.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 4, 5; Dec. Dig. ☞3.]

2. APPEAL AND ERROR ☞1050(1)—ADMISSION OF EVIDENCE—FAILURE TO OBJECT — ESTOPPEL.

In a suit for personal injuries, the improper admission of evidence relative to plaintiff's physical condition was not ground for reversal, where the witness, without objection, was allowed to testify to substantially the same effect.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153, 4157, 4166; Dec. Dig. ☞1050(1).]

3. TRIAL ☞85 — EVIDENCE — OBJECTION TO EVIDENCE ADMISSIBLE IN PART.

In an action for injuries, a lawyer's testimony in answer to a question whether he was

a physician that he supposed he was simply a layman in regard to surgery or medicine, but that he had tried so many personal injury cases and decided so many of them as a federal judge that the knowledge he had obtained in listening to physicians, together with whatever study of medical jurisprudence he had made, perhaps gave him a better knowledge of the human body and its injuries than the average man, was not improperly admitted over objection that it is argumentative, since only a part of the testimony was subject to such criticism.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 222–225; Dec. Dig. ☞85.]

4. APPEAL AND ERROR ☞1048 — HARMLESS ERROR—ARGUMENTATIVE TESTIMONY.

In a railroad employé's action for injuries, in the absence of any testimony of a lawyer relative to plaintiff's injury, the admission of his argumentative qualifying testimony that perhaps from experience in personal injury cases he was better qualified than the average man in regard to knowledge of the human body and its injuries was harmless error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4140–4145, 4151, 4158–4160; Dec. Dig. ☞1048.]

5. EVIDENCE ☞528 — OPINION EVIDENCE — MEDICAL EXPERT.

In an action for personal injuries, testimony of a medical witness, when asked if he could give any definite opinion as to whether or not the injuries to plaintiff were permanent, that the unexpected might happen, but that, if his diagnosis was correct, there was no authentic history of any case of such nature recovering, was not improper as being argumentative and involving extraneous matters.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2335–2337; Dec. Dig. ☞528.]

6. EVIDENCE ☞553 — EXPERTS — RESULT OF INJURY.

In a railroad employé's action for injuries, testimony of a medical expert that, if plaintiff fell from the top of the car and struck the ground on his back, the blow would have been sufficient to result in paralysis, was properly admitted in view of other testimony, though plaintiff testified that he did not know how he struck the ground.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2369–2374; Dec. Dig. ☞553.]

7. MASTER AND SERVANT ☞256—INJURY TO SERVANT—PLEADING—STATUTORY CAUSE OF ACTION.

In a railroad employé's action for injuries, the allegations of the petition as to insecurity of a handhold on a car, which broke when plaintiff grasped it, and that the statutes of the state required the road to see that its cars were equipped with safe handholds, and made it unlawful to use cars not so equipped, were sufficient, particularly in the absence of general demurrer, to plead a cause of action under Vernon's Sayles' Ann. Civ. St. 1914, art. 6713, providing that it shall be unlawful for any common carrier to use in moving interstate traffic any car unprovided with secure handholds.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 809–812, 815; Dec. Dig. ☞256.]

8. COMMERCE ☞27 — INJURY TO SERVANT — FEDERAL STATUTE—ENGAGEMENT IN INTERSTATE COMMERCE.

A railroad employé injured by the breaking of a defective handhold while setting the brakes on a car loaded with intrastate freight, which was part of a string of cars, being switched at the time, loaded with interstate freight, had a cause of action under the federal act as well as

---

under state statutes requiring that cars be equipped with secure handholds.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.]

**9. MASTER AND SERVANT ☞286—INJURY TO SERVANT — MASTERS' NEGLIGENCE — QUESTION FOR JURY.**

Under the common-law rule for establishing negligence, where there was evidence that the railroad car on which a switchman was injured by breaking of a defective handhold had been delivered to his employing company very recently, and that the defect could not have been discovered by a customary, careful inspection, the question of the road's negligence in using the car was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ☞286.]

**10. MASTER AND SERVANT ☞111—INJURY TO SERVANT—NEGLIGENCE OF MASTER—VIOLATION OF FEDERAL SAFETY APPLIANCE ACT.**

A violation by a railroad of the Federal Safety Appliance Act (U. S. Comp. St. 1913, § 8618 et seq.) is negligence per se.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217, 255; Dec. Dig. ☞111.]

**11. MASTER AND SERVANT ☞111—INJURY TO SERVANT—NEGLIGENCE OF MASTER—FAILURE TO COMPLY WITH APPLIANCE ACT.**

A railroad's failure to comply with Vernon's Sayles' Ann. Civ. St. 1914, art. 6713, making it unlawful for carriers to use any car unprovided with sufficient handholds, is negligence per se.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217, 255; Dec. Dig. ☞111.]

**12. TRIAL ☞139, 140—CREDIBILITY OF WITNESSES—QUESTION FOR JURY.**

By express statutory provision the jury are the exclusive judges of the credibility of a witness and the weight to be given to his testimony.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332–335, 338–341, 365; Dec. Dig. ☞139, 140.]

**13. DAMAGES ☞185 — INJURY TO SERVANT — EXTENT OF INJURIES—SUFFICIENCY OF EVIDENCE.**

In a switchman's action for injuries against his employing railroad, evidence *held* sufficient to support a finding that plaintiff sustained permanent injuries to his back and spinal column resulting in paralysis of his legs and certain organs.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503–508; Dec. Dig. ☞185.]

*On Motion for Rehearing.*

**14. TRIAL ☞75—OBJECTION TO EVIDENCE—WAIVER.**

In switchman's action for injuries against his employing railroad, the defense waived the right to object to a hypothetical question to a medical witness, as to whether the accident to plaintiff could or probably would result in paralysis, by its failure to object to other testimony to the same effect.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 171–182, 252; Dec. Dig. ☞75.]

Dunklin, J., dissenting.

Appeal from District Court, Tarrant County; R. B. Young, Judge.

Action by F. G. Sherer against the Texas & Pacific Railway Company. From a judg-

ment for plaintiff, defendant appeals. Affirmed.

Thompson & Barwise, of Ft. Worth, for appellant. Alexander, Baldwin & Ridgway and A. J. Power, all of Ft. Worth, for appellee.

DUNKLIN, J. F. G. Sherer, an employé of the Texas & Pacific Railway Company, and while engaged as a switchman in its yards in the city of Ft. Worth, ascended to the top of one of a string of freight cars, which were in motion at the time, for the purpose of setting the brakes in order to control the movement of the cars, which were then upon a switch track. After setting the brakes, he caught hold of the handhold or grabiron at the top of the ladder, which extended down by the side of the car near one end, for the purpose of descending to the ground. According to his testimony, the handhold gave way and caused him to fall. For alleged injuries resulting from the fall he instituted this suit against the company to recover damages in the sum of $30,000, and from a judgment in his favor for the sum of $11,250, the defendant has appealed.

The petition contained the following allegations:

"Fourth. That said handhold or grabiron was insufficient, defective, loose, or insecure, and directly caused plaintiff's injuries by being in such defective condition, and that it was dark, and the defective condition of said handhold was unknown to plaintiff.

"Fifth. That the statutes of this state required defendant to provide the cars in use on its road and tracks with sufficient and secure grabirons and handholds, and made it unlawful for defendant to use said car without sufficient and secure handholds and grabirons, and that in so using said car defendant was violating the laws of this state.

"Sixth. That under the Acts of Congress of the United States it was unlawful for defendant to use any car engaged in interstate traffic not provided with secure grabirons or handholds, and that said car or some of said cars which were being handled at the time and place of defendant's injury and which were being switched were cars that had come in from points beyond the state of Texas, and were destined to points in other states, and some contained articles of merchandise shipped from or having a destination beyond the borders of the state of Texas, and under the said act of Congress of the United States it was defendant's duty to provide secure handholds or grabirons on said car, which defendant failed to do, and such negligence of defendant thereby directly caused plaintiff's fall and injury, whereby defendant became liable to plaintiff for damages therefor."

Following those there were other allegations, in substance, that his injuries were caused by reason of said defective handhold.

In its answer the defendant, after specially denying the allegation that the handhold was insecure and defective, further alleged that it had no knowledge or information relative to the truth or falsity of the allegations that the cars which were being handled by the defendant at the time and place plaintiff claims to have been injured had come in from a point beyond the state of Texas, and were

destined to points in other states, or that any of them contained articles of merchandise shipped from, or having their destination beyond, the borders of the state of Texas, and hence was unable either to affirm or deny those allegations.

The defendant presented to the trial court a petition for removal of the cause to the federal court, upon the ground that it appeared upon the face of the petition that plaintiff was at the time of his injury engaged in the performance of duties pertaining to interstate commerce, and hence jurisdiction thereof was given to the federal court. As a further ground for removal it was alleged that defendant was incorporated under and by virtue of acts of Congress, and for that additional reason the suit is one arising under the laws of the United States. By an assignment of error appellant challenges the correctness of the order overruling that petition.

Section 8618, vol. 4, United States Compiled Statutes 1913, reads:

"On and after July first, nineteen hundred and eleven, it shall be unlawful for any common carrier subject to the provisions of this act to haul, or permit to be hauled or used on its line any car subject to the provisions of this act not equipped with appliances provided for in this act, to wit: All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grabirons on their roofs at the tops of such ladders: Provided, that in the loading and hauling of long commodities, requiring more than one car, the hand brakes may be omitted on all save one of the cars while they are thus combined for such purpose."

By section 8657 of the same statute it is provided that every common carrier while engaged in interstate commerce shall be liable for injury to, or death of, an employé—

"resulting in whole or in part from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

The statute last mentioned was one of the sections of an act of Congress passed April 22, 1908, and section 8662 of the statutes, which is another section of the same act, reads:

"No action shall be maintained under this Act unless commenced within two years from the day the cause of action accrued.

"Under this act an action may be brought in a [Circuit Court] of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this act shall be concurrent with that of the courts of the several states, and no case arising under this act and brought in any state court of competent jurisdiction shall be removed to any court of the United States."

The petition and bond for removal were filed in the trial court February 3, 1914, and the order overruling the petition bears the same date, while the judgment from which this appeal is prosecuted bears date January 2, 1915.

Section 5 and 6 of an act of Congress enacted January 28, 1915, read:

"Sec. 5. No court of the United States shall have jurisdiction of any action or suit by or against any railroad company upon the ground that said railroad company was incorporated under an act of Congress.

"Sec. 6. That this act shall not affect cases now pending in the Supreme Court of the United States or cases in which writs of error or appeals have been allowed at the date of its approval. And nothing in this act shall be deemed to repeal, amend, or modify the provisions of an act entitled 'An act providing for writs of error in certain instances in criminal cases,' approved March second, nineteen hundred and seven."

Act Jan. 28, 1915, c. 22, 38 Stat. 804.

[1] Numerous decisions might be cited to the effect that, as the Texas & Pacific Railway Company was incorporated by act of Congress, suits against it for damages in the sum sought in the present suit were removable from the state courts to the federal court, on the ground that it involved a question of law arising under the federal statute. But, as the employers' liability statute quoted above expressly provides that suits arising thereunder shall not be so removed, and as the present suit was brought under that act, that statute must govern to the exclusion of those decisions, rendered before its enactment. The decision of the United States Supreme Court in the case of K. C. S. Ry. Co. v. Leslie, 238 U. S. 599, 35 Sup. Ct. 844, rendered June 21, 1915, reported in the advance sheets, and which appears in 59 L. Ed. at page 1478, is conclusive of that question in favor of appellee.

Several assignments of error are presented to the admission of testimony of nonexpert witnesses who gave their opinions relative to the physical condition of the plaintiff. One of those witnesses was Chas. A. Hall, who testified by deposition as follows:

"Interrogatory: Please state whether or not he (referring to Sherer) is able to walk as other people do. Answer: No; he is not."

Hall did not qualify as an expert witness, and defendant objected to the question and answer upon the ground that the answer stated an opinion and conclusion of the witness, was argumentative, irrelevant, and prejudicial to the appellant.

Another witness was J. F. Bowyer, likewise a nonexpert, who testified to observation he made of plaintiff's movements on several occasions, and to whom was propounded the following interrogatory:

"State in your own way his appearance and physical condition as it appeared to you when you saw him at different times."

To that interrogatory he answered:

"He appears to me as a man that is absolutely helpless as far as his lower extremities are concerned."

Witnesses H. B. Cornell, Boatwright, and Thomas McMillan, all of whom were also nonexperts, testified to opinions substantial-

ly to the same effect as those of the witnesses first named.

Appellant has cited the case of Roth v. Travelers' Insurance Co., 102 Tex. 248, 115 S. W. 31, 132 Am. St. Rep. 871, 20 Ann. Cas. 97, and other authorities in support of its contention that the admission of the opinions of those witnesses was erroneous. We find in the record, however, that testimony of all those witnesses practically to the same effect was admitted in evidence without objection on the part of appellant. For illustration: The witness Hall, referring to the plaintiff, testified as follows:

"I have to help him off and on. I have to lift his legs up for him. He has to drag himself along with his crutches."

The witness Bowyer testified:

"Mr. Sherer is not able to walk as other people do."

[2] The witness Cornell testified:

"He is unable to use his limbs for the purpose of walking and his manner of locomotion is merely dragging of his body and by the use of his crutches, and he apparently has no control over his legs from his hips down."

It is a rule well settled that the improper admission of testimony will furnish no ground for a reversal if the witness is allowed to testify to substantially the same facts without objection. Hittson v. State Nat. Bank (Sup.) 14 S. W. 993, and authorities there cited; W. U. Tel. Co. v. Gorman, 174 S. W. 925; Walker Grain Co. v. Denison Mill & Grain Co., 178 S. W. 555; Jordan v. Johnson, 155 S. W. 1195; Railway Co. v. Dinwiddie, 146 S. W. 280.

[3, 4] B. S. Rodey, another witness for the plaintiff, was asked the following question:

"State whether or not you are a physician and have any knowledge or familiarity with surgery or medicine, or are you simply a layman in such matters?"

His answer thereto was as follows:

"I suppose I am simply a layman in such matters; yet I have tried so many personal injury cases as a lawyer and decided so many of them as federal judge of Porto Rico (see P. R. Fed. Reports, vols. 2, 3, 4, and 5) that the knowledge obtained in listening to physicians, together with whatever study of medical jurisprudence I have made, does, perhaps, give me a better knowledge of the human body and its injuries than the average man."

One of the objections urged by the defendant to that testimony was that it was argumentative, prejudicial to the defendant, irrelevant, and immaterial, and calling for extraneous matters. It will be observed that the answer of the witness was a qualifying statement only. The most serious objection to the answer was that it was argumentative, in that, in the opinion of the witness, his testimony should be given greater effect than that of the average man. But the objection was addressed to the answer as a whole, a part of which at least was not subject to that criticism. Furthermore, it is not probable that the argumentative portion of the answer was given any special significance by the jury. Further still, ap-

pellant has not pointed out any testimony of that witness relative to plaintiff's injuries, in order to show probable injury by reason of the argument.

[5] Dr. W. T. Salmon, who qualified as an expert physician, and who, after testifying that he had carefully examined the plaintiff and found that his lower extremities were paralyzed, that he had a loss of sensation or feeling in the lower extremities, and which also extended through the lower two-thirds of his body, was further asked if he was able to give any definite opinion as to whether or not the injury to the plaintiff was permanent. To that question he answered as follows:

"The unexpected can happen. If my diagnosis is correct, there is not an authentic history of any case of this nature recovering."

To this answer defendant objected on the ground that it was argumentative and involves extraneous matters which are irrelevant and immaterial to the issues of the present case. We do not think there was reversible error in this ruling. The testimony was but the expression of an opinion by a witness who had shown himself qualified to give such an opinion.

[6] Dr. J. M. Givins, over objection of defendant, was permitted to testify in answer to a hypothetical question propounded, in substance, that if Sherer fell from the top of a car and struck the ground, or ties, or some other hard substance, with his back, that, in the opinion of the witness, the blow which he might have received would have been sufficient to render him unconscious, cause him to spit blood, and would probably result in paralysis. The objection to this testimony was that there is no evidence to show, or tending to show, that the plaintiff, when he fell, struck with his back upon ties, or other hard substance. Notwithstanding the fact that Sherer testified, in effect, that he did not know just how he struck the ground, or upon what he struck, yet the majority are of the opinion that, in view of other testimony introduced, there was no error in that ruling.

[7] Article 6713, vol. 4, Vernon's Sayles' Texas Civil Statutes, reads:

"It shall be unlawful for any common carrier, engaged in commerce as aforesaid, to use in moving interstate traffic within said state any locomotive, tender, cars, or similar vehicle which is not provided with sufficient and secure grab-irons, handholds and foot stirrups."

The substance of that article, and also the substance of article 8618 of the Federal Statutes, quoted above, were given in the court's charge to the jury, following which was another instruction reading:

"Now, keeping in mind the foregoing instruction, if you find and believe from the evidence that plaintiff was injured on the occasion in question without fault on his part, and while exercising ordinary care for his own safety, and you further find and believe from the evidence that said injuries, if any, were directly and proximately caused by reason of the handhold

on said car being insufficient and insecure, then in that event you will find for the plaintiff."

Based upon the contention that plaintiff's pleadings did not present a cause of action arising under the state statute, appellant has assigned error to the action of the court in charging the duties imposed by that statute. We are of the opinion that the allegation of insecurity of the handhold contained in the fourth paragraph of the petition, followed by the further allegation in the fifth paragraph that the statutes of the state required defendant to see to it that cars used by it are equipped with safe and secure handholds, and made it unlawful to use cars not so equipped; was sufficient, especially in the absence of a general demurrer, to show liability for the injuries alleged to have resulted by reason of such defective equipment.

[8] Testimony was introduced which tended to show that some of the cars in the string of cars which were being switched at the time of the accident were loaded with interstate freight, while the one from which plaintiff fell was loaded with intrastate freight. This evidence, if true, would support a finding of liability under the federal statutes, as well as under the state statutes, since the setting of the brakes on the car equipped with a defective handhold was to control the movement, not only of that car, but of the interstate traffic cars as well. T. & P. Ry. v. White, 177 S. W. 1185, and authorities there cited.

Appellant's complaint of the court's ruling in permitting witness Hatfield to testify to the character of freight handled by cars generally during the night prior to the accident, which happened about 4 o'clock a. m., instead of confining such testimony to the character of freight with which the particular string of cars in question were loaded at the time of the accident, is based upon the assumption that the evidence showed without controversy that all that string of cars was loaded with intrastate traffic, and that no liability under the state statute had been alleged, which assumption is contrary to our conclusions stated above.

[9] The evidence showed that the car from which plaintiff fell did not belong to appellant, but had been delivered to it by another railway company, and that too only recently; and there was evidence further tending to show that the defect in the handhold could not have been discovered by such inspection as is usually and carefully made to discover defects in such equipments.

Under the common-law rule for establishing negligence, such evidence especially would have required the submission to the jury for their determination the issue whether or not appellant was guilty of negligence in using the car with such defective equipment, and to render a peremptory instruction on that issue in favor of plaintiff reversible error. Predicated particularly upon that evidence and that rule of the common law, assignments of error are presented to the action of the court in charging the jury, in effect, that the use by the defendant of the car equipped with the defective handhold was negligence per se; one of the assignments being based upon the refusal of defendant's requested instruction, in substance, that if the car, although so equipped, did not belong to the defendant, and if defendant, by the exercise of ordinary care, could not have discovered such defective condition of the handhold in time to avoid the accident, then a verdict should be returned in its favor.

[10] But it is well settled by the decisions of the Supreme Court of the United States that a violation of the federal Safety Appliance Act, noted above, is negligence per se, and that the common-law rule for determining whether or not the failure to perform a duty of that character is negligence does not prevail. St. L., I. & S. Ry. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; C., B. & Q. Ry. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582.

[11] It is also well settled by the decisions of this state that a failure to comply with such statutes as our employers' liability statute quoted above is negligence per se. G., H. & S. A. Ry. v. Kurtz, 147 S. W. 658; H. & T. C. Ry. v. Wilson, 60 Tex. 142; I. & G. N. Ry. v. Kuehn, 70 Tex. 582, 8 S. W. 484; S. A. & A. P. Ry. v. Bowles, 88 Tex. 634, 32 S. W. 880; G., H. & S. A. Ry. v. Roemer, 173 S. W. 229.

Accordingly, testing plaintiff's right of recovery either by the state statute or by the United States statutes, there was no error in the charge of the court that plaintiff would have a right to recover if his injury was caused by a defective handhold upon the car, thus, in effect, charging that a violation of either of the statutes referred to would be negligence per se. From this conclusion it follows that the assignments of error presenting the contention that the question whether or not the defendant was guilty of negligence in using the car from which plaintiff fell, equipped as it was with a defective handhold, should have been submitted for the determination of the jury as a controverted issue of fact, must be overruled. We are of the opinion further that the submission of the issue of permanent injury in the court's charge upon the measure of damages had a proper basis in plaintiff's petition contrary to the contention made by another assignment of error. And from the conclusions already noted it follows that there was no error in the court's refusal of defendant's requested instruction peremptorily directing a verdict in its favor, complaint of which ruling is made by another assignment predicated upon the proposition that there was no evidence to show that plaintiff was injured while engaged in interstate commerce, but that it conclusively showed that he was at that

time engaged in intrastate commerce, and that there was no pleading alleging that fact.

[12, 13] By defendant's assignments of error it is insisted that the verdict and judgment are erroneous because without sufficient evidence to support a finding that plaintiff sustained the injuries for which damages were allowed, especially the alleged injury to plaintiff's back and spinal column which it was alleged resulted in paralysis of his legs and certain physical organs. Following are the conclusions of the majority as expressed by them upon the assignments last mentioned:

"The majority think the statement of facts shows conflicting evidence in volume and of a character to take the issue to the jury and to sustain the finding of the jury thereon. True, the appellee's frank acknowledgment of falsification in making application for employment is well calculated to discredit his testimony and put him in an unfavorable light. But we do not believe such fact would justify the trial court in peremptorily charging the jury to find for the defendant, nor would it alone require that we should reverse the judgment upon the ground that the trial court, who heard the plaintiff and other witnesses testify, had an opportunity to judge as to their apparent truthfulness, and generally observe their demeanor while upon the witness stand, erred in failing to grant a new trial. Appellee, on examination in chief and upon cross-examination, testified at great length, and his acknowledgment, together with his explanations thereof, his manner of testifying, his air of sincerity, or otherwise, were all before the jury, and the jury, under the court's charge and by the express terms of our statute on the subject, were the exclusive judges of the credibility and the weight to be given to his testimony; so that the majority do not feel that it can be said as a matter of law that appellee perjured himself in testifying as he did that he was seriously and permanently injured in the manner detailed by him as a result of his fall. Moreover, the other testimony seems to establish without dispute the fact of a defective handhold, as appellee testified, and that he fell, or was found upon the ground in at least an apparently injured condition. Appellee's wife was explicit and positive in her statements of appellee's injuries. Of the nonexpert testimony many of the witnesses had observed appellee over periods of time of considerable length; many of them gave their opinion in positive terms of his condition. All of the physicians testified in his behalf qualified themselves as experts. Several of them examined him carefully, applying tests satisfactory to themselves, and gave it as their opinion that appellee was paralyzed, stating that such opinions were not based upon appellee's statements, but independent thereof. And the fact, in the opinion of the majority, that appellee was unable, or failed, to give a clear account of the precise place or manner in which he fell to the ground, or to explain precisely the place or organ injured at the time, will not destroy the effect of the testimony as a whole. So that, after as careful a consideration as the majority have been able to give it, we are of the opinion that the assignment of error attacking the verdict and judgment as unsupported by the evidence must be overruled."

For the reasons indicated, all assignments of error are overruled, and the judgment is affirmed.

DUNKLIN, J. (dissenting). It is quite apparent from the record that the damages awarded by the jury were based principally upon the claim made by the allegations contained in his petition reading as follows:

"That on account of said defective handhold plaintiff was caused to fall, or was thrown with great force and violence to the ground, striking the hard ground or ties or rails, and rendered unconscious; * * * that his spinal column, the ligaments thereof, and the spinal cord were injured, bruised, and dislocated, especially from the tenth dorsal vertebræ to the cocyx, so as to cause paralysis of the lower limbs, bowels, bladder, and rendering both of his legs useless, and he has been and is unable to walk since said injuries."

The petition contained the further allegation, substantially, that said injuries are permanent, rendering him a helpless cripple for life, and decreasing or entirely destroying his capacity to earn a livelihood.

The proof showed that plaintiff was employed by the defendant as a switchman in the city of Ft. Worth, and at the time of the alleged accident the crew with which he was working was engaged in making up trains in the railroad yards. According to plaintiff's testimony he mounted a string of cars while in motion for the purpose of setting the brakes, and the accident happened after setting the brakes on three of the cars. He further testified that the ladder from which he fell was on the end of the car, and that the space between that end of the car and the car following it was 2½ or 3 feet, and that the grabiron in question was on the roof of the car about 6 inches from the end. The manner in which the accident happened was detailed by him on the witness stand as follows:

"As I stated, when I went to get down, I caught hold of the grabiron, and I put my foot down on to the next grabiron on the end of the car, or the ladder of the car, as you call it. I was on the end, the east end, of the car, and on the south side. I was up on top of the car, and the grabiron set up like that. I caught hold of it and stooped down to reach this grabiron, and, when I started down my weight was on the top grabiron, part of my weight was on my foot, but the biggest part of my weight would be on the top grabiron, as I was swinging my body out from it. When I did that, the south end of the handhold pulled loose, and I swung around like that (indicating), and my hand slipped from the center of the grabiron to the end, and the sharp turn there broke my handhold loose, and I fell backward down between the cars. When I fell, I fell against the end of the other car, the car next to this one. It is about 2½ or 3 feet, I think, between the cars, and I fell against that car, and then went down between them and hit the ground. I don't know exactly where I did hit the ground. I don't know about that. I don't know whether I hit between the rails or outside of the rails. The inside of the ladder would be just about over the rails; just about over the south rail. The outside of the ladder would be entirely outside of the rails; that is, if the grabiron was on all right, but when it swung around that left the grabiron just about over the rail. I don't know what is the height of an ordinary freight car. It is about 10 or 12 feet, something like that. I think this car was a refrigerator car. * * * I was right up here in a position right off the top of the car with hand holding the top grabiron, and my right foot on the first step of the ladder, and my left foot in the air, coming down, and my hand—

hold broke loose, and I fell backwards, and my back struck the edge of the roof of the other car. * * * Now, my position on the car was as I have described, and when I fell back here east I struck the top part of this car here somewhere along there; I don't know exactly. I told you that I was in a sort of a reclining position over the top of the car, out from this car here (indicating), that would put me in a reclining position, I was stooping over with one hand on the handhold, that would be in a stooping over position, and when the grabiron gave way that would put me in a kinder lying down, stooping over position, between the two cars. All I had was just one foot on this grabiron below. When I say I was in a lying down position, I don't mean that I was lying down on anything, but just in the air when my hand broke loose; I was rearing back. When I fell, I fell down over the east end of the car, and swung towards the center of the track, but then, when the outside of the grabiron broke loose, that let me swing towards the inside of the track. After I hit the end of the other car I don't know exactly whether I went down between the cars or whether I went over to the other side, to the south side. * * * I did not hit on my feet that I know of; I don't know whether that was in between the cars or off to the side of the track; I could not tell. No one saw me fall from there any way that I know of. * * *"

Witness J. E. Hatfield, a switchman working with plaintiff on the occasion of the accident, but who did not witness it, testified, in part, as follows:

"I remember the occasion some time about 4 o'clock in the morning of the 23d of September, 1913, of his falling from a car down there, or of his being found near the track. I saw him after the accident happened, and when I saw him he was lying inside of the track, and he was unconscious at the time, to my knowledge of it. I assisted in picking him up, and we brought an empty car down there near him and on the next track, and loaded him in this car and took him down to the Main street to the ambulance. * * * I saw the car there with the handhold —with something wrong with the handhold there near to where he was lying. The handhold on the car was pulled loose at one end, at the inside end. If I remember right, the carman called my attention to it, and it was sticking out around the end of the car. * * * When I got to him, I found him with his head pointed towards the west, if I remember right, lying kind a little bit on the ties, and his body kinder out from the ties. It seems to me his head and shoulders were resting on the ties, and his feet were out from the ties, to the side of the ties. He was on the south side of the track. His head was to the west, I think, lying on the ties, and his feet were to the east, but they were not on the ties. He was outside of the rails, and he seemed to me to be unconscious. The car on which we found the loose handhold was, I should judge, about two car lengths east of him. It was standing still. I saw Sherer's lantern. It was in the center of the track. It was just about opposite to where we found him lying,—a little bit west and north, and his brake stick was in the center of the track. There were cars opposite to him, and his lantern and his brake stick were under the car. His lantern had gone out. He was lying on his side. I don't know whether anybody had moved him or not. One other helper on the crew had been down there before I was there, and he came down there towards me. His name is C. E. Martin. We took Sherer away from the side of the track. We loaded him into a car and brought him down the main line to Main street."

Plaintiff described the injuries he received in the fall as follows:

"I don't know now what part of my back struck the end of the roof. * * * I don't know that it did strike the roof. When I fell, I fell against the other car, the one east. When I fell, I don't know what I struck. My best judgment is that perhaps I hit the corner of the roof of the car, but I don't know. It struck me right in the back, I believe, but I don't know what part of the back. It put me in a lying down position; I don't know just exactly. I did not have time to think about where it hit me. I don't know exactly about what part of the back it hit me in. I have no recollection about it at all, that I know of. I know when I hit the ground or something hit me; I suppose I hit the ground. I have a recollection of a sensation like something hit me in the back of the head with a club. That was after I fell from the car. I remember falling from the car all right, but I did not have time to stop and figure out what part of my back hit the other car. I don't know whether it hit me about the neck, in the middle of the back, or down about the rump somewhere. I can't tell where it hit me— where I struck the other car. I cannot tell you what part of my back hit the other car. * * * After I fell the next thing that I remember was when they were carrying me into the hospital, I think; St. Joseph's Hospital I believe it is. I suffered from that fall. It caused me pain, and it caused me pain at that time. My head commenced to ache right away, and I was sick at my stomach and throwed up while I was in the hospital. I have throwed up a good many times since then, suffered with my stomach, and my eyes have ached so that I could hardly read, and my back has ached, and my limbs have ached. * * * Out in the hospital, St. Joseph's Hospital, after this fall, the pains and injury that I suffered was just a general ache all over. * * * I spit blood following this fall. I spit blood out at the hospital; and for three or four weeks, maybe longer—I do not remember just how long—after I got home, when I would cough would spit up clots of blood. My chest was very sore and pained me, and I taken a deep breath or coughed my chest would pain me through my lungs. I don't know whether my chest hit the car when I fell backwards or not. I don't know whether my shoulders or back hit the car right back of my chest. I had no visible signs of injury back there on the back of my back, that I know of. I don't know where I got any injury to my chest, only it was just awful sore just from the feeling of it."

He further testified that the end of the little finger of his left hand was pinched off, but he did not know just how that happened.

Plaintiff further testified that for a long time after the accident his kidneys, bladder, and bowels were so affected that they would not act without the use of artificial aids, and that blood passed from his kidneys. His wife testified practically to the same condition of those organs after his return to Albuquerque. Plaintiff further testified that his sexual organs had been entirely dormant since the accident. Furthermore, according to his testimony, he was a stout, healthy man before the accident, and others testified practically to the same effect. His age at the time of the accident was 29 years. Plaintiff further testified that he had never been able to walk since the accident; that he was unable to stand on his legs without the support of crutches.

The evidence does not definitely show how long plaintiff remained at St. Joseph's Hospital in Ft. Worth, but plaintiff testified that

it was eight or ten days. When he left that hospital he was taken to his home in Albuquerque, N. M.

Dr. Givins, the house doctor at the hospital and local surgeon for the defendant company, testified that he made several examinations of the plaintiff while at the hospital, stripping his clothing from his body, and examined his spine and back along his spinal column; that he found no discolorations or other external evidences of injury in that part of his body.

Dr. Saunders, also a surgeon of the defendant company, testified that he made a careful examination of the plaintiff while in the hospital, and discovered no surface indications of any injury to the back or spine.

No proof was offered of any character that plaintiff ever had any discoloration or surface indications upon his back indicating an injury thereto such as alleged in plaintiff's petition. Dr. Givins further testified that while at the hospital plaintiff got in and out of bed with apparently good use of his legs. Plaintiff testified:

"I first discovered that I could not use my legs right there in the hospital. They felt heavy there in the hospital. I could not move my legs freely there. I don't remember whether I moved them for a while there. I don't know how many days it was after I got to the hospital before I lost the movement of my legs entirely. I never have lost the entire movement of my legs since I have been hurt. * * * And I don't remember when I first discovered that I could not feel anything in my legs—whether it was right away or not. I don't know whether it was the first day, or the second, or the fourth day, or the tenth day, or what time it was, because I had no occasion that I know of to discover that."

Plaintiff, in addition to his own testimony that he has been paralyzed practically ever since he returned to his home, also introduced numerous nonexpert witnesses residing at Albuquerque, who were of opinion that plaintiff was paralyzed in his legs and the lower extremities of his body; those opinions being based upon the manner of his movements after he went to Albuquerque. He also introduced five physicians, all of whom, after careful examinations, were of the opinion that he was permanently paralyzed in his legs, and who testified that, in their opinions, such condition probably resulted from some injury to his back in practically the same locality alleged in plaintiff's petition, and most of whom based such opinion of probable injury upon the fact that in their examinations they discovered evidences of tenderness in that spot. The date of the alleged accident was September 23, 1913. Dr. Conner, one of the physicians, treated him three times a week for eight weeks, beginning October 15, 1913, and again making a final examination October 22, 1914. The dates of the examinations by the other physicians were as follows: Dr. Salmon, March 24, 1914; Dr. Pearce, August 3, 1914; Dr. Patchin, August 22, 1914; Dr. Rump, November 15, 1914, and again January 1, 1915. But it may be said in passing that one of these physicians also gave it as his opinion that such paralytic condition might have resulted from diseases in that spot, and his testimony upon that point seems uncontroverted. Two of those physicians further testified that the medical authorities recognize it as a possibility for a man in normal condition, such men being termed "human pincushions," to withstand certain tests made by them, such as pricking the flesh with pins, without giving any evidence of pain therefrom. It is also proper to observe further in passing that, according to opinions of four different physicians introduced by the defendant, plaintiff has never been paralyzed in his legs, but is a malingerer.

Aside from the testimony of the physicians introduced by him of a discovery of tenderness in the spot fixed by those physicians as to seat of the paralysis mentioned, the record fails to show any testimony by the plaintiff that he ever at any time suffered any pain or soreness in that spot, except his testimony that his back ached from one extremity to the other while he was in the hospital.

Plaintiff, when confronted with the written application he made to the defendant for employment, and during which employment the accident happened, testified with reference to the questions and answers as follows:

"In answer to question 11 in this application I say: 'I was last employed by the Denver & Rio Grande, and I left that service on account of going in business.' * * * I did not go into any business when I left that railroad. I went from there to the Santa Fé as night yardmaster, and in answer to that question 11 I did not state the facts as they were. I did not state the facts as they were at all. I knew at that time that the statement was not true, but I had a reason for doing it. I stated further in this application that I had never been in the employ of the Texas & Pacific before, and to the question, 'Were you ever injured on the railroad, if so, what road?' I answered, 'No.' I stated in this application that I left the Denver & Rio Grande and went into business, when, as a matter of fact, I went from the Denver & Rio Grande to the Santa Fé, and even after that then I worked for the Colorado Midland. Then I went into the transfer business after I had farmed three years, and then from the transfer business I went over in to Arkansas and railroaded there. I never told them about any of that at all. I don't know as I thought of all those places that I had worked, but I did not intend to tell them the truth about it. I did not intend to state the facts. I put that in there that I went into business just for an excuse. That is a practice that is very common thing among railroad men. I stated in this application that I had never been hurt, but I had been hurt, and that is the reason that I did not state the facts, because I had been hurt. * * * In this application here, where the question is asked, 'Were you ever injured on a railroad; if so, what road, and at what place, and the extent of the injury and in what manner?' that is, question 13, I wrote 'No' in there. That is my handwriting; that is written in my own handwriting. At the time I wrote that in there I knew that I had been hurt on the railroad twice

before, and I also knew that lots of railroads did not hire men that had been hurt; they won't hire them at all. I knew when I wrote that in there that I had been hurt twice, that I had had these claims against railroads, and that I had been paid money twice before that. I settled satisfactorily. I never even hired a lawyer. That statement as contained in the application was not the truth; it was not the fact as it was. The reason I did not tell them was because I wanted work. I needed work, and I thought that was the only way I could go to work, was to tell them an untruth about it. I thought that was the only way that I could go to work with railroads, and that was my trade. I did not state the facts down there to get work. I answered that that way to get work to support myself and my family. I had a wife and three children. * ·* * I did not make that statement in the application for the purpose of getting money, but it was made for the purpose of earning a living. I made that statement which I now admit is untrue, but there is a difference between that and what I am swearing to this jury. I was not under oath when I made that statement, and I am under oath now. I don't mind telling a lie, but I will not swear to one. I have respect for an oath. I never did tell a lie for money. I made a misstatement for the purpose of getting work. Even if the court had not sworn me a while ago, as he almost forgot to do, I think I would have told the truth about this. * * * I would not set up here and deliberately tell these jurymen a lie. Because I am sworn is one reason. I have respect for an oath. I don't want to go to the penitentiary; I am not looking for a home in the penitentiary. I have respect for an oath. It was necessary that I tell that lie in order to secure work from the railroad company."

That plaintiff tried the case upon the theory that the injury to his back and spinal column which resulted in the paralysis was caused by his back coming in violent contact with the hard ground or ties when he fell is apparent from the contention urged in his brief in reply to the assignment presented by the appellant and overruled by the majority, as shown already, in which assignment complaint is made of the admission of the hypothetical question propounded by plaintiff to Dr. Givins as to whether or not paralysis could result to the plaintiff if he had fallen from the top of a box car 11 feet 9 inches high and had struck the hard ground or the ties, or some other hard substance, with his back, with sufficient force to render him unconscious and cause him to spit blood; the objection to such testimony being that no evidence had been introduced that he had so struck upon his back when he fell. However, if the injury in controversy to the plaintiff's back was caused by his striking the end of the other car, perhaps it would not be a fatal variance from the allegations in the petition.

By the statutes of this state the jury are made the exclusive judges of the credibility of the witnesses and of the weight of the evidence, and decisions without number might be cited announcing the general rule that, where there is evidence beyond a mere scintilla which, if true, has probative force reasonably sufficient to support the verdict, such verdict cannot be set aside by an appellate court. But in Mo. Pac. Ry. v. Somers, 78

Tex. 439, 14 S. W. 779, a further well-recognized rule is announced by our Supreme Court in the following language:

"Although this court has the power to review a case upon the facts, and to set aside a verdict which has evidence to support it, that power has ever been reluctantly exercised. But it is the right and duty of the court to set aside a verdict when it is against such a preponderance of the evidence that it is clearly wrong. Willis v. Lewis, 28 Tex. 185; Dimmitt v. Robbins, 74 Tex. 441 [12 S. W. 94]."

And in that case a judgment for damages in plaintiff's favor was reversed because plaintiff, upon whose testimony alone it rested, gave upon two trials two inconsistent versions of facts upon a material issue, and gave a very unsatisfactory explanation of such inconsistency.

In Chandler v. Meckling, 22 Tex. 42, the following language was used:

"When it is clear that the evidence adduced is not reasonably sufficient (under all the circumstances of the case) to satisfy the mind of the truth of the allegations, then the verdict should be set aside, on the proper motion being made. Where it is made to appear, or is obvious to this court, that such rule has not been observed by the district court, it then becomes a proper subject of revision by the Supreme Court."

That decision was followed in Short v. Kelly, 62 S. W. 944, and in other decisions which might be cited.

In Zapp v. Michaelis, 58 Tex. 270, it was said:

"This court has no doubt held on many occasions, and wisely held, for many reasons, that where the evidence is so conflicting that the jury might well be justified in finding either way, that the verdict will not be disturbed. It, however, has never failed, when the occasion, in their opinion, required it, to set aside a verdict that was clearly wrong; as where it was without evidence or manifestly against the weight of the evidence. Willis v. Lewis, 28 Tex. 191."

In Easton v. Dudley, 78 Tex. 236, 14 S. W. 583, our Supreme Court used the following language:

"The evidence is no guide to the truth. Had the contradictory statements been made by two witnesses, one contradicting the other, the rule that there exists evidence to support the finding of the court would apply; but these statements are made by the same witness, which make his testimony at least of little value—not enough to justify a reliable conclusion."

That decision was followed by the Court of Civil Appeals for the Fifth District in Ætna Ins. Co. v. Eastman, 72 S. W. 431, in which a judgment was reversed by reason of conflict in the testimony of the plaintiff upon a material issue; such conflict being between his testimony on the last trial with that on the first trial. See other decisions cited in Ency. Dig. Tex. Rep. vol. 1, pp. 441–443.

It is also well settled that evidence which is contrary to known physical facts cannot support a judgment. 3 Cyc. 352. In G., H. & S. A. Ry. v. Walker, 38 Tex. Civ. App. 76, 85 S. W. 28, the Court of Civil Appeals for the Fourth District reversed a judgment because the court was of the opinion that the plaintiff in the case had reconstructed his evidence to meet the opinion of the court on a

former appeal of the same case, notwithstanding the fact that he testified that he knew nothing of that opinion, never read it, and never heard upon what grounds the former judgment was reversed.

In A., T. & S. F. Ry. v. Wiley, 118 S. W. 1127, the same court reversed a judgment on the ground of the insufficiency of the evidence to support the verdict, notwithstanding plaintiff testified to facts which tended to support the verdict, but which was of doubtful verity, and notwithstanding the fact that there had been two reversals in the same case for practically the same reason.

In G., C. & S. F. Ry. v. Wilson, 59 S. W. 589, the Court of Civil Appeals for the First District reversed a judgment upon the ground that it appeared from the evidence that plaintiff was guilty of contributory negligence, such finding being based upon a part of his evidence which, if taken as true, conclusively showed that he was guilty of contributory negligence, notwithstanding the fact that he testified to other facts which, if true, tended to show that he was not guilty of such negligence; in other words, it was reversed substantially upon the ground of the conflicting evidence of the plaintiff to the material facts in his case unsupported by other evidence. See, also, opinion of Justice Gill on the motion for rehearing in the same case, reported in 60 S. W. 438.

In Am. Nat. Ins. Co. v. Fulghum, 177 S. W. 1008, the judgment was reversed because it appeared to the Court of Appeals that:

"Plaintiff's version of the manner in which the accident occurred was evolved to meet the exigency of the case."

And in the opinion the court said further:

"Our courts have at all times manifested extreme caution in disturbing the findings of a jury where there is a conflict in the evidence, and always do so reluctantly; yet they have the authority (Nowlin v. Hall, 97 Tex. 441, 79 S. W. 806; Lee v. Railway Co., 89 Tex. 583, 36 S. W. 63) and it is their duty to interfere and set it aside where the verdict is against such a preponderance of the evidence that it is clearly wrong (Railway Co. v. Somers, 78 Tex. 439, 14 S. W. 779; Railway Co. v. Schmidt, 61 Tex. 282; Zapp v. Michaelis, 58 Tex. 275; Short v. Kelly, 62 S. W. 944; Kohlberg v. Awbrey & Semple, 167 S. W. 829)."

Following are decisions of our Supreme Court rendered after that court was deprived of the power to reverse a judgment for lack of evidence to support it, except when the evidence introduced is insufficient as a conclusion of law:

In Joske v. Irvine, 91 Tex. 582, 44 S. W. 1063, the court said:

"From a careful examination of the cases it appears: (1) That it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony in legal contemplation falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of proba-

tive force. If it so determines, the law presumes that the jury could not 'reasonably infer the existence of the alleged fact,' and 'that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.' The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty, or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining as a question of law whether the testimony establishes more."

To the same effect are Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788; Ft. W. Belt Ry. Co. v. Jones (Sup.) 166 S. W. 1130; Texas Loan Agency v. Fleming, 92 Tex. 458, 49 S. W. 1039, 44 L. R. A. 279; St. L. S. W. Ry. v. Shiflet, 94 Tex. 131, 58 S. W. 945; Tex. & P. Ry. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049; M., K. & T. Ry. v. Malone, 102 Tex. 269, 115 S. W. 1158; M. & E. T. Ry. v. Petty (Sup.) 180 S. W. 105. Of like import is Snipes v. Bomar Cotton Oil Co. (Sup.) 161 S. W. 1.

For the same reason judgments were reversed by this court in G., C. & S. F. Ry. v. Davis, 161 S. W. 932, and Medlin Milling Co. v. Mims, 173 S. W. 968, in each of which cases a writ of error was denied by our Supreme Court. To the same effect is Cobb v. Bryan, 37 Tex. Civ. App. 339, 83 S. W. 887, by the Court of Civil Appeals for the First District, but which decision seems never to have been reviewed by our Supreme Court.

In Ft. Worth Belt Ry. v. Jones, 166 S. W. 1130, supra, our Supreme Court said:

"A presumption of fact cannot rest upon a fact presumed. The fact relied upon to support the presumption must be proved. 'No inference of fact should be drawn from premises which are uncertain. Facts upon which an inference may legitimately rest must be established by direct evidence, as if they were the facts in issue. One presumption cannot be based upon another presumption.' 16 Cyc. 1051; M. P. Ry. v. Porter, 73 Tex. 307, 11 S. W. 324."

The testimony of plaintiff's witnesses that he was paralyzed as alleged, and that the cause of the paralysis might reasonably be attributed to some injury to his back in the locality alleged in plaintiff's petition, was sufficient to sustain a finding that the paralysis was so caused. But, according to other uncontroverted testimony offered by plaintiff and recited already, the paralysis could also reasonably be attributed to disease in that locality. However, as noted, there was a total failure of evidence to show that plaintiff's back struck the ground or any other hard substance when he fell, and hence there is an entire absence of proof beyond a mere surmise or inference that he at that time received any injury to the particular part of his back where the seat of his paralysis is located by the physicians. Nor was that theory of the case strengthened by the testimony of the witness Hatfield quoted which was contradictory, in that in one breath he says he found plaintiff lying inside the track, and in another that he found him lying on the south side of the track. Furthermore,

to conclude that plaintiff sustained the injury in question to his back when he fell against the end of the other car, if he did fall against it, would, in the opinion of the writer, be equally as unreasonable, in view of his testimony that he could not tell what part of his back or shoulders struck the car, and his testimony that, when the grabiron broke, he swung towards the center of the track and fell between the cars, a position where undoubtedly he would have been run over by the car following, and which testimony last mentioned was contradicted by his further testimony that he did not know whether he fell between the cars or outside. In Tex. & Pac. Ry. v. Shoemaker, 98 Tex. 456, 84 S. W. 1052, the court said:

"This fact of causal connection between an alleged negligent act or omission and an injury can no more be presumed than can the act or omission itself. Missouri Pac. Ry. v. Porter, 73 Tex. 307 [11 S. W. 324]; Texas & N. O. Ry. v. Crowder, 63 Tex. 505."

Tested by the common experience of men, it is inconceivable that plaintiff could have received a blow in a particular spot in his back so severe as to cause paralysis of his lower limbs without being conscious of such blow and its location at the time, and without retaining a definite recollection thereof, and without suffering some special pain in that particular part of his back, with no indication of such injury on the surface of his body, especially when his memory is so clear with respect to injuries to, and pains and soreness in, other portions of his body, and he does not testify to any lapse of memory of injuries sustained as a result of his fall. M. & E. T. Ry. v. Petty (Sup.) 180 S. W. 105, by our Supreme Court; Snipes v. Bomar Cotton Oil Co. (Sup.) 161 S. W. 1, also by our Supreme Court. Neither did any expert testify that such an injury could be sustained without the knowledge of the person injured if such person was at the time in possession of his mental faculties. If plaintiff had normal use of his limbs and other members, and normal sensibilities before and at the time of the accident, and if he testified to the whole truth as he was sworn to do, and detailed fully his injuries and sufferings, then it must follow logically and irresistibly that he did not sustain the alleged injury now under discussion, for, if he had been so injured, he would have known it at the time, and thereafter would have suffered some special pain or soreness at the particular spot alleged as the seat of the paralysis. A finding or conclusion otherwise would be unreasonable and unwarranted because contrary to well-known physical laws familiar to all mankind.

The burden was upon the plaintiff to make out his case prima facie at least. If his testimony be considered as a recital of all he knew of the accident and his injuries resulting therefrom, then it fails to show a causal connection between the alleged negligence of the defendant and the paralysis of which he complains, and the jury are left to supply the omission by indulging an inference or presumption in his favor. With knowledge of the facts of the injuries sustained, and failing to testify to the injury in that portion of his back fixed by his physician witnesses as the seat of the paralysis, no inference or presumption can be indulged in his favor to supply such omission of proof, even if such an inference was not opposed to known physical laws. In Skov v. Coffin, 137 S. W. at page 452, Justice Fly for the Court of Civil Appeals of the Fourth District, in disposing of one of the vital issues in the case, said:

"That the deed of trust was easily accessible to appellee is shown in the deed of Dort to J. B. Watkins, wherein it is recited that the deed of trust is recorded in a certain record book on a certain page. It is not pretended that proof of the deed of trust could not have been obtained, and a court will not go into the domain of presumptions, where direct proof can be obtained."

And in that case a writ of error was denied by our Supreme Court. If plaintiff's testimony be construed as a mere omission to testify upon the question now under discussion, and not as proof that the alleged injury causing paralysis did not result from the alleged fall, then not only should he be denied the benefit of a presumption in his favor on that issue, but a presumption must be indulged against him; for it is a familiar rule that a failure to produce evidence within the control of a party raised the presumption that, if produced, it would operate against him, and every intendment will be in favor of the opposite party. Mitchell v. Napier, 22 Tex. 120; Bailey v. Hicks, 16 Tex. 222; G., H. & S. A. Ry. v. Young, 45 Tex. Civ. App. 430, 100 S. W. 993.

In Mitchell v. Napier, supra, Wheeler, C. J., discussing the failure of one of the parties to the suit to answer certain interrogatories propounded to him by his opponent, and applying the common-law rule of evidence just stated, and without any reference to article 3685, 3 Vernon's Sayles' Texas Civil Statutes, for taking as confessed any interrogatory so propounded to a party, which statute apparently was enacted after the trial of that case, said:

"Where a party is thus afforded the opportunity to explain, and fails or refuses to do so, the rational and legal presumption is that a disclosure of the truth would make against him; and the jury are warranted in drawing the conclusion that he cannot, consistently with the truth, answer otherwise than by a confession of the facts which the questions are propounded to prove by his answers. It is upon this principle that the refusal to answer is deemed a confession of the truth of the alleged fact which the interrogatory is propounded to prove. The rule is deduced from the common observation and experience of mankind that men are ever ready to state all that is favorable to themselves, and that, when a party is interrogated as to the facts of a transaction in which he has acted honestly and fairly towards the other party, he will not hesitate to state truly what the real

facts of the transaction are. His answers will be full, free, and unreserved, manifesting · her evasiveness nor the suppressio veri."

Plaintiff's testimony, which was the only testimony relative to how the alleged accident happened and the injuries he received at the time, considered as a whole, is of itself intrinsically, and in material respects, too contradictory, indefinite, and uncertain to furnish any reasonable basis for the damages allowed by the jury for the alleged injury to his back and spinal column. And the unsatisfactory character of such proof is emphasized to a material extent by plaintiff's confessions quoted above that, in order to secure the very position held by him at the time of the alleged accident, and to earn by hard labor the salary incident thereto, he willfully and fraudulently falsified his answers to questions propounded in his written application, especially when considered in connection with the further fact that this suit wherein damages were sought in even a much greater sum than was allowed, furnished a far more potent motive for falsifying his testimony on the witness stand. And the fact that he further said he would not lie under oath adds little, if any, weight to his testimony, especially as he also said that his testimony would have been the same if no oath had been administered.

For the reasons indicated, the writer is of the opinion that the assignment to the admission of the testimony of Dr. Givins in answer to a hypothetical question, and noted already, that the alleged paralysis probably resulted from plaintiff's striking the ties or some other hard substance when he fell, and the further assignment that the evidence was insufficient to sustain a finding that the alleged negligence was the proximate cause of such alleged paralysis, should be sustained, and that the judgment should be reversed; the writer concurring in overruling all other assignments of error.

On Motion for Rehearing.

[14] The hypothetical question propounded to Dr. Givens, defendant's objection thereto, and the answer of the witness the admission of which was made the basis of appellant's fourteenth assignment of error, which was overruled by the majority, as shown in their original opinion, were as follows:

"Q. Whether if the plaintiff, Sherer, had fallen from the top of a box car 11 feet and 9 inches from the grabiron on which he stood to the ground, and had fallen on his back on the hard ground or the ties, or on other hard substance, with sufficient force to render him unconscious and cause him to spit blood, it could or probably would result in paralysis."

Answer of the witness:

"Certainly that would be fall enough to paralyze a man."

The objection urged by defendant to the question and answer is that it was hypothetical and without a sufficient predicate therefor, in that neither plaintiff nor any one else had testified that he fell upon his back, and, fur-

ther, because the words "probably would" embraced in the question called for an opinion and conclusion of the witness which would be too speculative and remote.

In addition to the reasons given in their former opinion for overruling that assignment, the majority sustain the contention now urged by appellee for the first time in his reply to appellant's motion for rehearing, viz., that defendant's right to object to the hypothetical question so propounded to Dr. Givens, and his answer thereto, was waived by its failure to object to the following testimony introduced by plaintiff:

By Dr. Rice: "If the plaintiff had fallen from the top of a box car with sufficient force to render him unconscious and cause him to spit blood, I would say that it is possible that such a fall as that would or could probably have produced paralysis; such an injury to the cord as to produce paralysis."

By Dr. Salmon: "If the plaintiff had fallen from the top or from near the top of a freight car while he was engaged in switching cars, and had fallen upon a hard substance or ground with sufficient force to render him unconscious and cause him to spit blood, in my opinion, the condition in which I found the plaintiff to be and suffering at my examination of him could have been produced by such a fall. And, if the plaintiff received such a fall on September 23, 1913, and was in the condition in which I found him at the time of my examination, and has been in practically that condition since September 23, 1913, then it is my opinion that his injuries are permanent."

By Dr. Pearce: "If the plaintiff had fallen from the top or near the top of a freight car, while engaged in switching cars, to the hard ground, or upon some other hard substance, with sufficient force to render him unconscious and cause him to spit blood, it is my opinion that the condition in which I found the plaintiff suffering at the time of my examination of him could or would probably have resulted from such a fall."

By Dr. Conner: "If the plaintiff had fallen from the top or from near the top of a freight car while he was engaged in switching cars, and had fallen upon the ground or other hard substance with sufficient force to render him unconscious and cause him to spit blood, it is my opinion that the condition in which I found the patient at the time of my examination and treatment of him could and would have been produced and would have resulted from such a fall. It is my opinion that the condition in which I found the patient suffering at the time of my examination and treatment of him was due to direct violence."

In his reply to the motion for rehearing appellee has called attention to further testimony introduced not cited in his original brief, which the majority desire to cite as supporting their conclusion in overruling appellant's contention of the insufficiency of the evidence to support a finding that as a result of his fall he sustained an injury to his back which caused his alleged paralysis:

Sherer testified:

"I fell against the next car and fell to the ground and was unconscious. I fell against that car, and then went down between them and hit the ground. I fell backwards down between the cars. I knew when I hit the ground or something hit me. I suppose I hit the ground. I have a recollection of a sensation like something hit me in the back of the head with a club. When I say I was in a lying down

position, I don't mean I was lying down on anything, but just in the air when my hand broke loose; I was rearing back. After 1 fell the next thing I remember was when they were carrying me into the hospital. I have never been able to walk since that time. I spit blood out at the hospital, and for three or four weeks, maybe longer. In going from the hospital to the train, they lifted me off the bed and carried me to the ambulance. I fell backwards, and my back struck the edge of the roof of the other car. After I hit the end of the other car, I don't know exactly whether I went down between the cars or whether I went over on the other side, to the south side. I remember hitting the ground or something hitting me; I don't know what it was. I don't know when they found me. My back was hurting me all over the whole length of my back. There was a particular point that seemed sorer than any where else. When this handhold should come loose that would throw me right back against the car. I could fall back on my back on the ground. * * * it was about 10 or 12 feet from the top of the car to the ground."

Dr. Pearce testified:

"Such abnormal injuries or conditions as I found the plaintiff suffering from at the time of my examination of him, in my opinion, were caused by direct violence."

Dr. Patchin testified:

"I believe that the condition in which I found the plaintiff at the time of my examination of him was caused by his injury. I found no syphilis or blood disease, of any kind, nor tubercular trouble, nor did I find any tumors or abscesses or anything of that kind."

Witness Hatfield testified that he found plaintiff soon after the accident lying just outside the rails or the track apparently unconscious.

According to testimony of plaintiff's brother, plaintiff was apparently in normal condition and in good health immediately before the accident, but since the accident had never been able to walk "as other people do"; that while at the hospital he spit up blood, and the nurses turned him in bed from one side to the other.

The car inspector said he found one end of the handhold on the car had pulled out, and that the wood in which it had been fastened was rotten.

Plaintiff testified that immediately after his injury his limbs felt heavy and numb, although while at the hospital in Ft. Worth he never complained of his legs being paralyzed. Dr. Givens testified when he examined plaintiff two or three days after his arrival at the hospital in Ft. Worth he complained of lack of sensation in his legs.

Dr. McLean, witness for defendant, testified:

"It is a rule laid down by the authorities, such as Church and Peterson, under that condition of traumatic lesions, of the cord substance, that it is noted that vertebral fracture-dislocations are frequently devoid of any external signs of displacement."

The motion for rehearing is overruled by the majority.

DUNKLIN, J., dissenting as on original hearing.