MISSOURI, O. & G. RY. CO. v. PLEMMONS.
(No. 7197.)

(Court of Civil Appeals of Texas. Dallas. Nov. 7, 1914. Rehearing Denied Nov. 28, 1914.)

1. MASTER AND SERVANT (§ 276*)—INJURIES TO SERVANT—ACTION — EVIDENCE — SUFFICIENCY.
    In a suit by a brakeman, who claimed to have suffered severe injuries by reason of the breaking of a handhold on a car, which precipitated him to the ground, evidence *held* sufficient to justify a finding that the injuries claimed were suffered in the manner asserted.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. § 276.*]

2. DAMAGES (§ 185*)—ACTIONS — EVIDENCE— SUFFICIENCY.
    In a personal injury action, evidence *held* sufficient to sustain an award of $4,500 damages.
    [Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503–508; Dec. Dig. § 185.*]

3. MASTER AND SERVANT (§ 124*)—INJURIES TO SERVANT—STATUTES.
    Under Acts 31st Leg. c. 26, § 5, and Acts 31st Leg. (1st Ex. Sess.) c. 10, § 3, declaring that no carrier engaged in intrastate commerce shall use cars not provided with secure handholds, etc., and that no employé injured shall be held to assume risk or to have been guilty of contributory negligence, if the failure of the carrier to equip the cars with such appliances, or to comply with any statute for the safety of employés, contributed to the injury, and together with Safety Appliance Act Cong. 1893 (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1913, §§ 8605–8612]), and Act Cong. April 22, 1908, c. 149 (35 Stat. 65 [U. S. Comp. St. 1913, §§ 8657–8665]), which contain similar provisions, a railroad company, sued by brakeman for injuries caused by the giving way of a defective handhold, cannot escape liability on the ground that the car was one belonging to different company, and that it was only bound to inspect it for apparent defects.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

4. EVIDENCE (§ 127*)—ADMISSIBILITY—PRESENT SUFFERING—RES GESTÆ.
    Evidence of declarations of present pain and suffering in the nature of verbal acts is admissible to show that a party suffered personal injuries.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 377–382; Dec. Dig. § 127.*]

5. MASTER AND SERVANT (§ 204*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.
    Under Acts 31st Leg. c. 26, § 5; Acts 31st Leg. (1st Ex. Sess.) c. 10, § 3, requiring railroad cars to be equipped with secure handholds, and declaring that an employé injured by reason of the failure of the railroad company to comply with such provisions does not assume the risk of his employment; a brakeman injured by the giving way of a defective handhold does not assume the risk although he knew of the defect.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 544–546; Dec. Dig. § 204.*]

Appeal from District Court, Grayson County; W. M. Peck, Judge.

Action by H. W. Plemmons against the Missouri, Oklahoma & Gulf Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

John T. Suggs, of Denison, and Head, Smith, Maxey & Head, of Sherman, for appellant. McReynolds & Hay, of Sherman, for appellee.

TALBOT, J. Appellee instituted this suit against the appellant, Missouri, Oklahoma & Gulf Railway Company, and Missouri, Oklahoma Railway Company of Texas, to recover damages for injuries sustained by him on or about March 13, 1913, while employed as a freight brakeman. It is alleged, in substance, that while so employed it became necessary for him to climb down the side of a car while moving, for the purpose of signaling the engineer, and that while so engaged a grabiron or handhold gave way, resulting in his fall to the ground and the infliction of the alleged injuries. It is further alleged that the hand-

hold and surrounding parts were defective, which caused it to give way; that defendant failed to properly equip the car and to maintain the handholds in proper condition, and that it negligently failed to inspect the car and handhold, and that he did not know of the defects and omissions alleged and complained of; that as a result of appellant's negligence, causing him to fall, his back, shoulders, sides, and hips were bruised; the bones, tendons, nerves, muscles, and ligaments of his spinal cord were lacerated, torn, and otherwise injured, his kidneys and nervous system disordered, his eyesight impaired, and a rupture on his right side caused. It is further alleged that defendants were partners, their lines constituting one system, and that they were engaged as carriers by railroad for hire engaged in interstate commerce, and were agents for each other. Defendants answered by general demurrer, denial of partnership and agency, and alleged that they were separate corporations organized under the laws of different states. They denied the negligence alleged, that plaintiff fell, and that he sustained any injuries and had thereby been damaged. They pleaded affirmatively, but not under oath, that plaintiff, prior to the receipt of his injury, knew or was properly chargeable with knowledge of the matters and defects complained of by him. No denial was filed by plaintiff with respect to such affirmative allegation. Trial was had before a jury, special issues being submitted to them, and upon their findings judgment was rendered in favor of plaintiff for $4,500 against appellant on November 24, 1913. The jury were peremptorily instructed to find in favor of defendant, the Missouri, Oklahoma & Gulf Railway Company of Texas. Appellant filed exceptions to the findings of fact by the jury; and a motion for new trial. This motion being overruled, appellant excepted and appealed to this court.

[1] By its first assignment of error appellant contends that the verdict of the jury and the findings of fact with respect to the plaintiff having been injured by falling from the car as alleged are so greatly against the preponderance and great weight of the testimony that such findings and the judgment rendered thereon should be set aside. This contention is based upon the assertions: (1) that the testimony of the appellee was unsupported by that of any other witness, and was to the effect that he attempted to climb down off the side of a car, a part of a train in motion, running from 8 to 15 miles per hour; that the roof handhold gave way while a portion of his body was above the car, so that the distance he fell was greater than the height of the car; that he weighed 235 pounds; that he fell backward, with no opportunity to attempt to break the force of his fall with hand or foot; (2) that the undisputed evidence shows that upon examination of plaintiff at various times thereafter, the first time

immediately after such fall, there were disclosed no broken bones, no bruise, no cut or abrasion of the skin, or even a reddened skin, and no visible evidence of any kind or character to show that plaintiff had fallen as he claims to have done; (3) that aside from the incredible character of the statements, based on the common knowledge of ordinary men, there was a large amount of evidence that it would be impossible for a man of plaintiff's size and weight to sustain such a fall under the circumstances detailed without there being any evidence of injury visible. This assignment will be overruled. We think the evidence sufficient to authorize and sustain the findings of the jury and judgment rendered.

Among other things appellee testified:

"We had some work to do at Durant, and when we got ready to leave we picked up a car off the house track and put it in the train. It was an N. O. & N. E. car. When the engineer whistled for Kenefick I started over the train to signal the engineer in regard to dropping this car. The train was going about 15 miles an hour, and there was a higher car ahead of this car that I couldn't step up on, and I decided to sit down on the car back of the high car and give the signals. I took hold of the handhold and started to climb off, the handhold being on top of the car. The handhold pulled off and threw me to the ground. The handholds are of iron, and are used for the purpose of ascending and descending cars. When I started to get off this car I intended to attract the engineer's attention and signal him to drop the car into the south end of the house track. I couldn't see him very well from where I was, and I was climbing off so I could see him. The handhold pulled off and threw me backward, and I fell to the ground. I suppose I fell 14 or 15 feet, and was knocked unconscious. A man came up the track and pulled me out of the mudhole I was lying in. I was numb all over, and felt that way until they came and picked me up. When they put me in the caboose I had an awful pain in my back and shoulders. I was lying against a rock. There was a big, long cushion in the caboose and they carried me into the caboose on it. I lay there some little time and was then removed to the hotel near by. I stayed there until they picked me up at night at 8 o'clock, I suppose. I suffered untold agony there in that hotel all evening. I suffered with pain in my back and shoulders and through my hips, and in fact I was sore all over from my head to my feet. I reached Denison about 2:30. An ambulance took me to my room. Dr. Long, the company surgeon, came to see me, and examined to see if he could locate the trouble and left some kind of tablets. That was about 3 o'clock a. m., and he came back about 10 a. m. I was in awful pain during this time. I couldn't turn over; I couldn't move any way. I just lay on my back. Couldn't move in the bed. Right here in my lower privates was giving me an awful lot of pain, hurt me awful bad. I noticed that next morning worse than any other time. Commenced hurting after they got me to my room. It hurts all the time. Its just a sharp pain in there. Dr. Long said he would come back Sunday, and he didn't come, and I had Dr. Acheson come over. Dr. Acheson relieved my pain and has been my physician since. Dr. Long never came back any more. The first time I sat up was the 3d of April; I couldn't sit up. I couldn't raise up until that time. The soreness in my shoulders had gone down in the lower part of my back. The pain in my private parts was hurting me very much and has been ever

since. It has hurt every day and every night since. In bad weather it is worse. The worst pain is in the small of my back. At night I can't sleep. Hardly ever have a good night's sleep since I was hurt. I am up and down all night with my back, and it has been that way all the time. I take a little exercise every day. I feel very good as long as I am stirring a little. If I go uptown and stay a few hours, I am restless all night. During this time my groin has been awfully tender and sore. Sharp pains hit me occasionally. It is worse when I am standing. My kidneys give me an awful lot of trouble. I am up three or four times a night, and there is a pain follows after making water. My left eye has hurt me all summer. It hurts worse than my right eye. My right eye gives some trouble but I can't read with my left eye at all, can't see anything with it hardly. It was the middle of summer when my eyes first began hurting. A skim came over my left eye now at times and I have to wipe it out with my handkerchief. My eyes are worse now than they were in July. They are getting worse. I have suffered pain through my head. Yesterday I had an awful pain through my head here. My eyes hurt and I can't see out of my left eye. It waters a good deal of the time. When I close my right eye I can hardly see at all with my left eye. There was nothing the matter with me before I received this injury as I have been as strong a man as there was in the country. I can't do anything at all. I can hardly sit around the house in good shape, much less work. I am using crutches to walk with. I am able to walk without them, but I have awful pains in my back."

On cross-examination appellee said:

"At the time this accident occurred I guess I weighed 235 pounds. I never saw a bruise or scratch or red place or any other kind of mark on my skin or person following that fall. I couldn't see my back."

This witness further testified:

"Prior to the time I received this injury, I had been as strong a man as there had been in this country, I suppose. My occupation had been that of a railway man—brakeman and conductor. I had never been injured before this time. I had never had any claims or suits against any company. Business was pretty dull at the time I was hurt. I did not know what I was earning. I suppose I was earning $50 or more per month when I got hurt. I was working every day I could. I was extra brakeman. From extra brakeman you are promoted to regular brakeman, and from there you are promoted to conductor. The average earning capacity of a regular brakeman in the employment of the Missouri, Oklahoma & Gulf was about $100 per month, I suppose. Since I have been hurt, I have not been in condition or able to do any work. I have been incapacitated because I have pains in my body so that I cannot do anything at all. I can hardly sit around the house in good shape, much less work, without pain."

Dr. Acheson, called by the appellee, testified:

"I have been a physician and surgeon since 1867 and graduated from the University of Pennsylvania. I know H. W. Plemmons. I began to treat him last March. He was in bed in a rooming house on the north side of Main street. I examined him then and subsequently. I found him crippled and suffering pain. I gave him medicine to moderate the pain. He was complaining with his back and of pain in the right groin. I found in the right groin an incomplete rupture, or total rupture and incomplete hernia. I found a tearing of the inguinal ring that was sufficiently large to admit the tip of the finger, surrounded by the skin. I have seen him since probably two or three dozen times. At one time he had a little bit of fever, not much. Didn't amount to quite a degree. I found that his pulse ranged from 132,000 a day to 155,000 a day; normal pulse is about 103,000 a day. The respiration was about 51,000 a day where the natural respiration is about 24,000. The blood pressure was low, being about 102 when lowest normal blood pressure is about 110. His blood pressure has increased as high as 220. Blood pressure means the pressure exerted by the heart to drive the blood through the arteries. His blood pressure kept coming up. I found that the kidneys had been injured. Blood made its appearance in the urine. The specific gravity of the urine was from 1,020 as high as 1,030. It contained no albumen at the beginning, but did later. It was also alkaline. The presence of albumen indicated a derangement of the kidneys, which permits the escape of albumen. I found something else in the urine. I found crystals of oxalate of calcium, both letter form and dumb bell. This indicated a degeneration of the kidney tissue; that is, a diseased condition of the kidney tissue. That will deteriorate a man's general system. I made the tests microscopically and by chemical analysis. The presence of cysteine crystals always denotes degeneration of the kidneys. I took photographs of his urine, and this photograph represents cysteine crystals that are escaping from the system and blood is escaping through the urine. That condition is such as would deplete a man's general system. It causes high pulse and respiration by the injury to the kidneys acting on the heart. The loss of blood makes the remainder of the blood watery and thin. Mr. Plemmons' heart is injured. The apex beat is outside the left nipple when it should be inside the left nipple. There is a diastolic murmur of the heart. The man has some cyanosis, a redness of blueness of the surface of the body. That is due to the condition of the heart resulting from the injury to the kidneys. I tested his eyes. A man ought to read a black letter a quarter of an inch square in a good light at 15 feet; the best he can do is to read a letter that is ⅜ of an inch square. The field of vision is $9/13$ of what it ought to be in the right eye. In the left eye it is ⅓ of what it ought to be. I examined his eyes with an instrument called a perimeter. Anesthesia is a loss of sensibility. Mr. Plemmons' right leg is benumbed. I tested his strength with a dynamometer. Mr. Plemmons' injuries are permanent. I don't think he will ever be able to work as a brakeman or conductor. When I examined him there was some swelling in his back. There was no tearing of the skin or anything on the back. It wasn't discolored any. I found no bruises, and I found no abrasions or roughening of the skin of the back. The man is on the verge of neurasthenia, lack of nerve strength. His right eye is numb."

This witness further testified:

"A man with a high pulse might be in condition to do some physical labor, light work, but not such work as is incident to the duties of a brakeman or conductor on a railroad. This man has had his kidneys injured, and is passing blood through his urine which is depleting them. His kidneys are affected and show that the blood is impure. The impure blood is affecting his heart and has diseased it. The affection of the kidneys is closely associated with the function of the eyes, and his vision is affected; is imperfect. The man is weak and on the verge of neurasthenia. His respiration is disturbed. It is twice as fast as it ought to be, and his pulse is entirely too rapid. Neurasthenia is lack of nerve strength. I say in my opinion the plaintiff's condition is permanent. I do not believe he will ever get well of any of the troubles that I have mentioned. I do not think that he will get well of that from 132,-000 to 155,000 pulse rate. The loss of blood

from the kidneys is what causes the pulse rate, and it depletes any man to lose blood. I don't think his pulse rate will ever be any less as long as that blood keeps up. I said I thought the conditions I testified to were permanent. I meant his disability was permanent."

Dr. T. W. Crowder, who made a specialty of eye, ear, nose, and throat practice, testified that he had examined the appellee's eyes by request, and that from his examination, independent of what appellee said, there was no defect in his vision that he could find. He said that he had appellee to read letters across the room 15 feet; that "there was a discrepancy in the answers of appellee with respect to his ability to see with one eye and both eyes, by which he said he meant that, with both of his eyes tested together, appellee read type at 15 feet that he should have read at 20, with his right eye he read the same type, most of the letters, with his left eye he called only part of the letters at 15 feet, which he should have read at 30 feet." This witness further testified:

"Assuming that a man was injured the 15th day of March and along about the 1st of July he commenced to have dimness of vision and pain in his eyes and can't see well and his eyes give him pain when he reads, a condition of that kind could result from a diseased condition of the kidneys. A great many things cause a weak condition of the eyes; a rundown condition of the whole system would cause it, or any special disease that would pull you down in a general way. Anything that is depleting could cause a weakened condition of the eyes. If a man's kidneys are weakened and caused to do excessive work, that is a depleting condition, and that would cause a rundown condition and weakened condition of the eyes, or could cause an organic condition there. With reference to the weakened condition we have got to depend almost entirely on what the patient tells us."

Mrs. Plemmons, appellee's wife, testified: "I heard of Mr. Plemmons complaining of having been injured. I was in Chattanooga at that time. I noticed a difference in his appearance when I met him here to what it was when I saw him in February. When I saw him here he complained of his back and kidneys and the small of his back. His back was swollen and rigid, and swelling over the kidneys on each side. The swelling comes and goes. At times there is a swelling, and again there is not, but generally there is. There is no difference in the swelling now as compared to what it was when I saw him in April. He does not rest at night. He gets up during the night three or four times. His condition about getting up had been worse in the last three months. He says his eyes burn and hurt. He does not read very much. His eyes look red. After he has taken any exercise he does not rest."

We have not, of course, attempted to quote all the testimony bearing upon the nature and extent of appellee's injuries. It is too voluminous to do so. With respect to them the evidence is conflicting, but sufficient to support the judgment. Clearly, we would not be authorized to say that the judgment is so greatly against the preponderance of the evidence, if so at all, that it is clearly wrong, and under the uniform decisions of this state, unless we can so say, it should not be disturbed.

[2] The next contention is that:

"The verdict of the jury for $4,500 is not supported by the evidence, and is so grossly excessive as to show the jury were influenced by some improper motive, and it should not be permitted to stand. With this contention we do not agree. The evidence quoted above, together with other testimony in the case, if true—and the jury have said in effect, by their verdict that it is—is amply sufficient to justify and support the finding of the jury that appellee, as the direct result of appellant's negligence, had sustained damages in the amount awarded him."

[3] The third, fourth, and fifth assignments of error complain, respectively, of the court's action in submitting to the jury the fifth, sixth, and seventh questions propounded to them. The fifth question is:

"Was defendant, Missouri, Oklahoma & Gulf Railway Company, guilty of negligence, as that term has been defined to you, in permitting the fastenings of said handhold to be in a defective condition, if it did, and out of repair, if it did, at the time plaintiff attempted to descend from said car?"

To which the jury answered "Yes."

The sixth question is:

"Did the defendant use ordinary care, as that term has been defined to you, to maintain the fastenings of said handhold in a reasonably safe condition for brakemen to ascend and descend from said car at the time plaintiff claims to have received said injuries?"

To which the jury answered "No." The seventh question is:

"Was the negligence of said defendant, if any there was, in failing to use ordinary care to maintain the fastenings of said handhold in a reasonably safe condition, if it did so fail, the direct and proximate cause of plaintiff's injuries, if any he received?"

To which the jury answered "Yes." The contention is, in substance, that the submission of these questions was error, because the undisputed evidence shows that the car from which appellee alleges he fell was a "foreign car," and the only duty of appellant was that of inspection and not the duty of maintaining said handhold in a safe and secure condition, and because the seventh question assumes negligence on the part of the appellant and submits an issue not raised by the pleadings. There was no error, at least of which appellant can complain, in the submission of either of the forgoing issues. The evidence doubtless showed that the car from which appellee fell was not owned by appellant, but belonged to another railway company, therefore a "foreign car," but that fact, under the law as it exists now and as it existed at the time appellee was injured, did not relieve appellant of the duty of maintaining the handhold upon said car which gave way and caused appellee to fall in a safe and secure condition. The statute of this state, passed in 1909 (Acts 1909, p. 65, §§ 5, 7), provides:

"That from and after January 1, 1910, it shall be unlawful for any common carrier engaged in commerce as aforesaid [intrastate commerce] to use, in moving intrastate traffic within said state any locomotive, tender, car or similar vehicle which is not provided with sufficient and secure grabirons, handholds and foot

stirrups"; and "that any employé of any common carrier engaged in commerce as aforesaid who may be injured or killed, shall not be held to have assumed the risks of his employment or to have been guilty of contributory negligence if the violation of such carrier of any provision of this act contributed to the injury or death of such employé."

Likewise the Safety Appliance Act of Congress, enacted in 1893 and amended in 1896, provides "that it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grabirons or handholds," and provides that any employé injured on any car in use contrary to the provisions of this act shall not be deemed to have assumed the risk, although he had full knowledge. The act of Congress of 1908 made contributory negligence also unavailable as a defense, which under the prior acts had remained a defense. Schlemmer v. Railway, 220 U. S. 590, 31 Sup. Ct. 561, 55 L. Ed. 596; U. S. Comp. St. 1913, § 8659. Another of our state statutes (Laws 1909, p. 280, § 3) enacts:

"That any action brought against any common carrier under and by the provisions of this act to recover damages for injuries to or the death of any of its employés, such employé shall not be held to have assumed the risks of his employment in any case where the violation of such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé."

In Railway Co. v. Kurtz, 147 S. W. 658, the foregoing statutes are quoted, and it is held that they make it the absolute duty of railway companies to have the cars in use equipped with secure handholds, regardless of the question of reasonable care to have and keep them secure, and that where an injury to an employé happens from an insecure handhold, said statutes deny to the employer the defenses of assumed risk and contributory negligence, citing Delk v. St. Louis & S. F. Ry. Co., 220 U. S. 580, 31 Sup. Ct. 617, 55 L. Ed. 590. In the case cited it is further held that where the accident complained of happened after the statutes referred to took effect, it is immaterial whether or not the train of the railway company was engaged at the time the accident occurred in state or interstate traffic; that "railway companies, under these statutes, are required to do more than exercise ordinary care to have and maintain secure handholds, etc. They are required to do more than exercise a high degree of care. They are required to do all things that are possible to that end, even if they have for that purpose to keep inspectors on every train they move. Under these statutes there would seem to be no defense available unless it be that the plaintiff himself deliberately caused the handhold, which gave way and injured him, to be insecure." The accident resulting in appellee's injuries happened March 13, 1913, and at that time the statutes quoted were in force. The train upon which appellee was at

work was engaged in interstate commerce, and it was appellant's duty to have the car from which he fell equipped with secure handholds. This duty the jury have said it failed to perform, and, the law being as stated, there was no error of which the appellant can complain in submitting the question under consideration for the determination of the jury.

[4] There was no error in the admission of the testimony of the witnesses Pope and Diggs to the effect that appellee was "complaining with his back and shoulder." At least none appears either from the bill of exception reserved to the court's ruling or any statement of the evidence made in the brief. Our examination of the statement of facts, however, leads to the conclusion that the declarations of the appellee of pain and suffering, as detailed by the witnesses Pope and Diggs, were declarations or expressions of present pain and suffering and admissible in evidence. Railway Co. v. Johnson, 95 Tex. 409, 67 S. W. 768; Railway Co. v. Hibbitts, 49 Tex. Civ. App. 419, 109 S. W. 228.

[5] Under the statutes quoted above and the decision made in Railway Co. v. Kurtz, supra, if it be conceded that appellee knew the handhold which gave way and caused him to fall, was defective, he did not assume the risk of using it. There is no pretense that he produced the defective condition of the handhold, and it seems that in no other event would the defense of assumed risk be available to appellant. The evidence, however, does not show that appellee knew of the defective condition of the handhold before the accident.

The verdict of the jury is sustained by the evidence.

None of appellant's assignments of error disclose any ground for a reversal of the case, and the judgment of the court below is therefore affirmed.