**McADOO, Director General of Railroads, v. CAMPBELL. (No. 589.)**

(Court of Civil Appeals of Texas. Beaumont. July 20, 1920. Rehearing Denied Oct. 13, 1920.)

1. **Master and servant ⊜⇒286(13)—Negligence as to detective using handhold on car held for jury.**

In an action by a railroad detective for injuries occurring when a handhold on a car gave way, whether the handhold was insecure and insufficient for the use for which it was intended, and whether such condition was due to negligence imputable to the defendant, *held* for the jury.

2. **Master and servant ⊜⇒285(7) — Proximate cause of injury to railroad detective on car held for jury.**

In an action by a railroad detective, for injuries received when a handhold on a car gave way, whether negligence in furnishing an insecure and insufficient handhold was the proximate cause of the injury *held* for the jury.

---

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Harris County; William Masterson, Judge.

Action by Cline V. Campbell against W. G. McAdoo, Director General of Railroads. Judgment for plaintiff, and defendant appeals. Affirmed.

Andrews, Streetman, Logue & Mobley, of Houston, for appellant.

Presley K. Ewing, of Houston, and A. B. Geppert, of Teague, for appellee.

BROOKE, J. The plaintiff, Cline V. Campbell, sued the Houston Belt & Terminal Railway Company for damages, but later amended, dismissing the railway company, and substituting W. G. McAdoo, Director General of Railroads, in conformity with special order No. 50 of the Director General. By his first amended original petition, filed November 30, 1918, he claimed damages in the amount of $25,000, alleging the loss of his hand and other injuries, due to a fall by reason of a handhold having been insecurely fastened to a box car upon which he was climbing, while he was in the service of Wm. J. Burns Detective Agency, engaged in guarding the property and performing other services in behalf of the Houston Belt & Terminal Railway, then under the control of, and operated by, the Director General of Railroads. The cause came on for trial at the December term, 1918, and was submitted by the court to the jury on December 10th, by special issues. The jury then returned a verdict, answering the issues propounded. The court thereupon, upon motion of plaintiff, entered judgment in plaintiff's favor in the amount of $4,500, with interest thereupon and all costs of court: The defendant duly filed his motion for a new trial, which was by the court overruled, whereupon exception was taken and notice of appeal given. The appeal was perfected by filing of the appeal bond on the 17th of January, 1919. The record having been duly prepared and filed, this cause is now before the court for review on the assignments hereinafter presented.

Cline V. Campbell was an employé of the William J. Burns International Detective Agency, Inc., and for that concern was engaged in the work of guarding the properties and performing other incidental services for the Houston Belt & Terminal Railroad, then under the control of, and being operated by, the Director General of Railroads of the United States government. Since no question is raised in this appeal as to the right of Campbell to ride moving cars, or as to the duty of the Director General toward him concerning the safety of equipment on such cars, we will assume that there was owing the duty of ordinary care with respect to handholds on the box cars and other cars that Campbell was supposed to

224 S.W.—50

ride. This cause of action is predicated upon the theory that a handhold pulled loose, that he fell, and suffered the loss of his hand, same having been run over by the moving cars.

Appellant's first assignment of error attacks the sufficiency of the evidence to support the finding of the jury that defendant, his servants or agents, were negligent with regard to the condition of the handhold in question, or with regard to the sufficiency or security of the fastenings thereof, or in any respect as submitted to the jury.

To this proposition appellee makes the following counter proposition:

"The jury's verdict having concededly excluded the contention that the plaintiff was in any way responsible for the insecure condition of the handhold, the verdict and judgment for plaintiff must be affirmed (1) because the defendant's duty to maintain for plaintiff a secure handhold was an absolute one, not dependent upon any negligence; and (2) if aliter, it was a warranted inference or finding for the jury that the defect in the handhold from which plaintiff fell, if arising from the willful act of a third party, or howsoever arising, would have been discovered in time to have avoided the injury by the exercise of ordinary care in proper inspection."

Plaintiff, though technically in the employment of the William J. Burns International Detective Agency, Inc., was engaged through it in doing service as watchman for defendant of the railroad property, and was for that purpose an invitee, lawfully upon the premises; and in ascending the ladder of the moving train, as he was doing at the time of his injury, he was where he had the right to be, and was acting within the scope of his employment, so that the defendant was under duty to him the same as his own employés, and concerning this, in his brief, concedes:

"Since no question is raised in this appeal as to the right of Campbell to ride moving cars, or as to the duty of the Director General toward him concerning the safety of equipment on such cars, we will assume that there was owing the duty of ordinary care with respect to handholds on the box cars and other cars that Campbell was supposed to ride."

The appellant, as indicated by his remarks in the statement of facts, has not attempted to state in his brief the effect of all the evidence, and the parts quoted are chiefly the evidence which was most favorable to his side.

The appellee, being required to show only evidence sufficient to support the verdict, makes the following statement:

"Cline V. Campbell, the plaintiff, testified, in substance, that at the time of his injury, on January 31, 1918, the William J. Burns International Detective Agency, Inc., was under engagement to defendant, William G. McAdoo, as Director General of Railroads, including the

Houston Belt & Terminal Railway Company, to perform the service of watchman and guarding such railway company's property, the watchmen employed, including himself, to perform this service being under control and direction of the foreman, Ed Heard; that he talked with Ed Heard at the latter's shanty on Hamilton street, about five minutes before the accident, then went to and around the engine of the train, standing still, returning along the opposite side of the cars; that plaintiff's hours of service on the day of his injury were from 12 o'clock noon to 12 o'clock at night, and that some other of the watchmen was on the same duty during his off hours; that it was in the line of his duty under his employment to go and be on the railroad premises, to examine the seals of the cars, to prevent depredations and thefts, but not to inspect handholds and ladders or anything of that sort; that it was similarly in the line of his employment to ·follow the cars from the house tracks, at or about the Union Station in Houston, to the defendant's distributing South yards, about three or four miles distant, and to that end to ascend the ladder on the car in question as he attempted to do, when it was moving off in the train that was taking the cars from the house tracks to the South yards; that it was within the scope of his employment and in the course of his duty for him to do so; that while so ascending the ladder, about or above midway of the car from the bottom to the top, the handhold, being insecure, pulled out, throwing him to the ground, whereby his left hand was cut off by the train running over it; that, 'if handholds are securely fastened, they will not pull out; it is customary to have them securely fastened; that he was born September 10, 1897, was 21 years old on the 10th of September, 1918; that his family, besides himself, was composed of his wife and baby; had married when he was about 19 years of age; that the ladder upon which he attempted to climb was on the rear of the car;' that he was going to South yards to watch the railroad property out there, did not see anybody fooling with the handholds before he was hurt, neither did he know of anybody fooling with them; did not see any wrench lying around; was not his duty to watch the handholds; hadn't fooled with the handhold himself; hadn't had a wrench; that the handhold pulled out and fell to the ground with him, and his hat went off. He further directly testified, 'If that handhold had been tampered with by anybody, they had not done it with my knowledge, consent, or authority.' "

"J. C. Campbell, the father of the plaintiff, produced, identified, and testified to the correctness of the family Bible, which showed the age of the plaintiff to be as testified by him.

"J. M. Boswell, plaintiff's brother-in-law, testified to having gone to the scene of plaintiff's injury, within a very short time after it happened, and in company with Ed Heard to have found plaintiff's hat alongside the train from which he claimed to have fallen, and on the side from which he claimed ·to have ascended the car, and also the pulled out handhold, about six or seven feet from the handhold. He testified 'that handhold we found was one of the handholds of a box car.'

"Ed Heard, witness for defendant, testified that the shanty he occupied was a little off Hamilton street to the south; that he talked with Campbell at this point about twenty minutes before the accident; ·that Campbell then left him, going in the direction of the engine, which was south of that point, and when he returned, injured, he came from the north of such shanty, the train moving south; that he 'watched cars down there every night of the world'; that 'we were supposed to look at those cars every day and night'; was there 'to prevent any depredations of property'; that if Campbell undertook to climb one of the box cars to look it over and go out to the South yards, there to look over the property, such 'was in the ordinary course of his work'; that there were three of the watchmen, including himself and Campbell, who worked all night, and others who worked days; that his little shanty was on Hamilton about ten feet from Prairie, and the cross streets north from Hamilton, in order, were Chenevert, Jackson, and Crawford, the latter being the street upon which the Union Depot stands; that after the accident, and plaintiff had come to him on Hamilton from the north, calling for help, he found plaintiff's hat and lamp between Hamilton and Chenevert, nearer Hamilton, and the handhold about 63 feet further north, both findings being to the north of Hamilton; that the train was standing still when the conversation occurred with Campbell, just shortly before the accident, but it moved, 'running at a pretty good rate of speed,' just before Campbell came back from the north, saying he was hurt; that after his conversation with Campbell, before the accident, Campbell 'just about had time enough to go there and mount a car that was moving off, then get back to me at the time I saw him, which was just about such a time as I would expect a man to go there, if he did have such accident as that'; that Campbell, when he left witness just before the accident, would go about three-quarters of a block across to the house track 9, then he might have gone north or south along the train; 'but most undoubtedly, if he went to some other point on the car, he would naturally go north; he would have to·go to the rear end; I think he was riding the rear end at the time—I think it was.'

"W. S. Leonard, defendant's witness, was the car inspector, and the only one, who inspected the cars on the house tracks 9, 10, and 11, during the day preceding the night of the accident, and he testified: 'A car inspector, all he has to do is to look over the cars and see that they are in good order, and those that are in bad order put tags on them and send them to the "rip." * * * Ordinarily in the inspection of cars we just glance over them; that is, we inspect them to see if the handholds are all there, to see whether the couplers and seals are all O. K. and in good. running order, and see if the lift rods do not have to go over every handhold, if we can just look and see.'

"This was on direct examination, and the attorney for the defendant, evidently recognizing the insufficiency of such inspection, put to the witness this question, 'You mean put your hands on the handholds?' to which the witness answered: 'We do not have to do that. We just look at them. Sure, we can tell whether the bolts are there or not by such inspection.'

"He further testified: That he knew at the time he looked over the cars there was nothing wrong with the handholds, and that a carman could look at a car and tell a good one when he

sees it; can glance at the grabiron and see if the bolts and nuts are there, and, if they are, that the car is bound to be safe; that 'they hardly ever came out then.' He finally admitted that 'if they [the handholds] are properly inspected and properly cared for, they won't come out; so that, if you find them coming out in the course of a day's work, why they are either defective, or else they have not been properly looked after—that is the usual condition;' that he examined, the day in question, the three strings of cars on the house tracks 9, 10, and 11, where they were loaded during that day, to be taken at night to the South yards for distribution and departure; did not know how many were on each track, but they extended to the end of the 'House'; had to go up and down them, on both sides, for inspection; that on the day in question, between 7 and 8 in the morning, he 'went on the G. N. Rip and stayed there until that transfer was made, sometimes it would be eleven o'clock and sometimes it would be eleven thirty, just whatever time they would get in, I would get back to the House'; that he inspected the cars thoroughly in the morning, then at noon he came along, then in the evening—'left there about 5:15 going through those cars.'

"C. L. Pease, defendant's assistant yardmaster and witness, testified: 'That there was an average of about eighteen or twenty cars in that string that went to South yards that night,' being the night of plaintiff's injury. He testified: 'That switching process is very frequently done by the kicking or flying switch method of procedure—the kicking, anyway. Frequently you will have tracks crossing over one another, and you want to put one car in one track, then you want to put the next car in the next track. It frequently happens, in the process of switching, that the first car will not go as rapidly into its track as was anticipated, and that bumps at the end are frequent; it is what we call "cornering," is the regular name for it—regular railroad name. We frequently "corner" the cars, and that they may injure the ends of the cars, and it may injure the portions of the cars where the handholds of the cars are; that could happen. I have known that to happen in the course of my employment by railroads.'

"Again: 'Right here in the yards, when they are loading these cars, getting them ready for the outgoing trains, it is a fact that there is a great deal of switching backwards and forwards in order to locate them on the tracks where they are wanted; to put them in the tracks where they are wanted; that is true. There are spur tracks down there, too; and while in the process of this switching down here, that same "cornering" of cars would occur.'

"Further he testified: 'These cars that are loaded down here, with reference to the place where the plaintiff claims he was hurt, are located at the House; that is, they are "spotted." We have two inspectors who work there all day inspecting those empties. They are "spotted" the night before. They inspect those cars in the daytime. They have always had two inspectors down there. * * * I do think that two would be necessary to inspect the quantity of cars that are loaded there, say three tracks of 22 apiece in them. They do light repair work after they inspect their cars; that is, they repair what work is to be done on them.' That he had seen handholds come out when the cars

wear out; had seen them come out that way; had seen inspectors come along and take hold of them, and pull them to see if they were strong—that is frequently done. 'That it is not customary or usual in the service for a handhold, when a man climbs up on it, to pull out or off; it is not expected to do that; it is dangerous to the working man or the man sent to climb up on those ladders, when the train is moving, or even when it is not moving, to have a handhold in such an insecure and insufficient condition that it will come out; where the handholds are secure and sufficient they will not come out.' 'That they pull the cars from the House every day to the South yards; begin about 7 o'clock at night, and are ready to start about 8:30; there is not more than one trip made.'

"C. H. Manker, defendant's yardmaster of South yards, and witness, testified that, in response to Pease's telephone, he stopped the train in the South yards and had the inspectors to look over it; that they found the two defective cars testified about by defendant's witnesses, one a Santa Fé car with the handhold off entirely, and the other a C., B. & Q. car with the handhold there but off on one side; that one of these cars was pretty near to the head end, and the other pretty near to the rear end; that the nuts of the handhold entirely off were gone; that only one trip that night was made to South yards of cars from the house tracks, and that in the 'drag there might have been 22, 25, or 30 cars'; that 'if there were 66 cars on the three tracks down there, he (the engineer) only brought about a third of them in that train—the rest of them didn't belong out there.' He testified to the 'conclusion' that the car had not been cornered, but admitted, 'I have seen lots of cars cornered.' Further testified: 'When these cars are loaded down there near the depot, the customary method of working is to switch them backwards and forwards until they get them into the right location. Then they are inspected down there, and in the evening hauled out to the South yards, and distributed to the outgoing trains; that is the course or the way that business is handled. Many of those tracks are spur tracks, and crossing one another, and there is a great deal of switching up and down in order to locate these cars and to distribute them and to send them out, both ways.'

"He also testified, as to the missing handhold, that: 'The nuts were not there; without the nuts the bolts do no good.' And again: 'If your nut is not there, the grabiron will pull out; if your nut is secure, why it won't pull out; when it is found insecure, of course that is remedied.'

"R. B. Vallee, defendant's engine foreman and witness, testified: That upon the train arriving at South yards inspection of the cars was made; that 'in making that inspection they went up on the ladder on each side of the cars, and tried the handholds to see if they were loose'; that the method of making this trial was to go up to the handholds, take the handhold, with the foot on the next one, and 'if they are loose, of course they will give; they do that to see if they will give;' that one of the two defective cars found—a Santa Fé car—had the handhold entirely gone, and the other—a C., B. & Q. car—'the handhold was fastened on one side'; that the former, the one with the

handhold gone, 'was pretty close to the engine'; he estimated 'the third or fourth car from the engine'; and, that 'this other car with the handhold gone' was south of Hamilton street; that is, towards the South yards, in the string before we pulled out, and the one with the handhold loose at one end was between Hamilton street and Crawford street, 'estimated at about five or six cars from the rear'; that 'this car (the Santa Fé, with the handhold entirely gone) was pulled off of No. 11 track'; that there were about 25 or 28 cars in the string that went to South yards that night, and that the track No. 9, one of the three House tracks, would itself hold 22 cars, 21 or 22, from Hamilton street to Crawford.

"Cross-examined as to the proper method of inspection, and as illustrating that adopted at the South yards that night, he further testified: 'We did climb up and down those cars; that is, some of the rest of them did. I believe Mr. Fowler did. They pulled at the handholds or grabirons as they walked up and down. You put a strain on them as you go up and down them to find out whether or not they are secure. We were looking for these handholds to see if they were securely attached, and by the means we used we could tell whether they were securely attached. Any other man that was an inspector or knew what he was doing could tell just as well as I could that way; that is true. That is the way they would go at it to inspect the cars, to find out whether those handholds and grabirons are securely attached or not; that is the right way to do it.' He testified that 'cars in the switch yards cross one another frequently on the tracks and spur tracks; they sometimes locate the cars by kicking them; * * * cars are frequently cornered and injured that way. I have seen handholds broken that way, or knocked off. * * * In point of truth, excepting for the switching about there, these cars had been up here for what is called the House tracks, near the depot, during that day; that is the place they load them up with outgoing freight; and there is, when we make them up, a good deal of switching backwards and forwards in those yards to get the cars located like they are wanted.' That in putting on handholds in the beginning, and through the investigation of them and the repair of them, they use a wrench on them frequently; they also use a wrench in putting on the nut. That 'these cars were put in there on that House track that night; like to-night, they would be put in there to-night and moved out to-morrow night'; that the nut is put on from the outside; 'it is then visible to an inspector.' He testified: 'Regardless of the condition of the bolts on the outside and such of the bradding as there may have been, what holds the handholds secure in the rear, there is a nut. If that timber gets rotten or loose, or the nut gets weak or out of fix, why the handhold may be insecure; that is true; and when it is insecure. I mean by that it is not in a sound condition, not a secure condition, and when it is that way, it is apt to fall out, and it is dangerous in the service.' He further testified: 'I believe there is a watchman on the job of looking after those House tracks all during the day as well as at night; * * * that is my understanding, and my understanding of the condition that existed at that time.'

"J. B. Whitson, an employé and witness for defendant, testified that he was a car inspector, but 'not an expert—do not claim to be an expert.' Further: 'Two things must concur to make a bolt safe, where a nut is used on the end of it, for security—that nut must be all right in its threads, and the bolt must be all right in its threads. If either is defective, it may impair the security of the hold.' That 'the nut was put there to hold the handhold; if it was in a defective condition, it wouldn't hold the handhold. * * * Didn't see the threads or grooves in the nut, because I didn't see the nut.' He testified: 'I won't tell the jury that this man (meaning plaintiff) ever fell from the Santa Fé car or that that was the handhold he pulled off; I have no knowledge of that event.' He further testified (being one of defendant's car inspectors) that he was accustomed to inspect handholds and grabirons by merely looking at them, and admitted; 'If the defect was not visible to me, I could not tell whether they were secure or insecure.' That he did sometimes take hold of them, and admitted, 'When you do it, that is a test by which you can tell.' And, further, that 'the way to test that would be to put force upon it, and see whether or not it is secure; if you didn't do that, you could get fooled sometimes.'

"A. C. Lopez, being defendant's car inspector and witness, testified that if for any reason the nut became defective, so that it would come off, 'the handhold would come too; that would be the natural course;' that 'the nut is there to hold the handhold on securely'; that the bright threads of the bolt would not show any difference if the nut had been off one or two days; that he had seen cars coming together, called 'cornering,' break off and injure the grabirons and handholds.

"F. P. Cleaver, foreman of the car department of another railroad, defendant's witness, testified that the handhold entirely gone—the one from the Santa Fé car—was the second handhold from the bottom; that he didn't see the nut—'don't know what condition the nut was in.' He further, likening cornering of cars to a similar collision by automobiles, testified: 'If there is a projection on the car or automobile or vehicle, whatever it is, sticks out, and the striking of the other car might hit that thing, and not hit the wood of the car at all, it might injure that projecting thing without injuring the wood of the car.'

"B. C. Cunningham, car foreman for Southern Pacific Lines, defendant's witness, testified that the bolts were about six and one-half inches long, the size of the head of a bolt one-half inch, and the size of the nut a one-half inch; that he knew cars were sometimes cornered, and had 'known of handholds on cars being injured by cornering'; that, in his own words, 'I will admit to the jury that the handholds on these high box cars project out some distance from the cars; they project out two and one-half inches—that is the clearance'; that 'the place on a bolt that the nut goes over, whether the nut fits tight or loose, will be more or less protected from the weather; being protected, it will be more apt to remain bright in the part that is not entirely exposed to the weather; that is true; the part entirely exposed is more apt to rust and show age'; that 'it could be in a condition, a nut could, on handholds, so that it would work off; * * * if the threads had entirely worn out of the nut,

it could be slipped off and not slip the threads' (of the bolt) 'in perfect tact'; that by deduction or argument he had 'concluded' that the 'handhold had been tampered with only because he found the bolt threads bright and intact, and this was all he rested his deduction or conclusion on; that 'the majority of the handholds are torn off by cars striking them'; that another frequent cause of injuring handholds—'see it every day'—is chaining or attaching an uncoupling car to the handhold—'that is what breaks nine-tenths of the handholds, unfair usage'; that, in his own words, 'I have seen very loose nuts on handholds, bolts, and it is improper whenever you see them; those handholds should be securely attached; that is a very important part of the car; men are expected to climb up and down them, and, if the handholds give way and come out, why the effect is to throw them.

"George Beale, defendant's car inspector and witness who engaged in the inspection at South yards after the accident, testified that, 'if the nut was on there and was in good condition, it (the handhold) would hardly come off; it might come off if the nut was bad; * * * do not know what condition the nut was in that came off; did not see it;' that, referring to the inspection at South yards after the accident, to the best of his recollection 'there were about twelve or fourteen (cars) in the drag they inspected.' And again, 'I do say that according to my recollection there were twelve or fourteen cars in that string, and that is all we did inspect there at that time—that night. I have reference to the cars that came from the House tracks that we inspected.'

"A. P. Fowler, defendant's witness and switchman of the crew that took the 'drag' to South yards after the accident, testified that he would 'judge there were somewhere in the neighborhood of 25 to 28 cars in that string, something like that'; that the only reason he had for saying that the nuts had been taken off the bolts was that 'the rust had been broken where the nuts had been taken off'; that, as the train stood on the House track, the third car from the engine 'would be beyond Hamilton street from here,' which would mean to the south of Hamilton street; that the track on which the train then was (No. 9) from the bumping post at the north end to the extreme end of the track 'will hold just twenty-one cars, scant'; that 'when the handhold comes off it is bound to come off from the nut coming off; * * * and if it does come off when a man is using it, and the bolt comes off, it is bound to be that the nuts are off.'

"L. M. Jacobs, the defendant's master mechanic and witness, testified that he saw a wrench mark on the nut that remained at one end of the loose handhold on the C., B. & Q. car, but admitted 'it is true that in the repair of handholds the repairers frequently use these instruments that turn the nuts—those monkey wrenches; I have no personal knowledge of when the marks of that wrench were put on or by whom;' that he found the handhold of the Santa Fé car entirely gone, and did not see either of the nuts of that handhold; that the nut that works on the threads of the bolt is put there to hold the handhold onto the bolt; 'there are grooves in the nut that grip hold of the threads on the bolt—that is the strength it has got, and this is all the strength that it has

got'; that he did not know whether the missing nuts were old or new, whether they had a split on them, or whether they had worn out in their grooves, or, if so, to what extent.'

"The remaining testimony, that of defendant's witness B. C. Banbrick, his witness L. C. Evens, his witness Willis Knipe, and his witness E. C. Andrews, related entirely to the now abandoned issue, that plaintiff had self-inflicted his injury.

"Cline V. Campbell, the plaintiff, testified in rebuttal, in addition to other testimony on said abandoned issue, that he had been on duty from 12 o'clock, the day of his injury, and that he had not paid any attention to the handholds, as that was not in the line of his employment, but that the handholds were not tampered with during the time he was there, from 12 o'clock that day until the time he was hurt that night.

"He testified: 'I had been on duty from 12 o'clock that day. I was around on those House tracks about every five minutes, at the place where those cars were; hardly ever over five minutes. No one during that period that I was around there that day had time or opportunity, without me seeing them, to have tampered with those cars, as is claimed they did. Those cars were not tampered with during the period of my service from 12 o'clock that day until the time I was hurt; and I give as my reason for saying that, that I had the opportunity to observe those cars.'"

That the evidence warranted the conclusion that the facts were such as entitled plaintiff to recover on account of the insecurity of the handhold, regardless of any question on negligence, see Vernon's Tex. Civ. Stats. vol. 4, art. 6713; Railway Co. v. Enderle, 170 S. W. 276; Railway Co. v. Plemmons, 171 S. W. 259; Railway Co. v. Roemer, 173 S. W. 229; Railway Co. v. Sherer, 183 S. W. 404; Railway Co. v. Martin, 161 S. W. 405; Railway Co. v. Kurtz, 147 S. W. 658.

Amendment of 1910 to Federal Safety Appliance Act of 1893, approved April 14, 1910, c. 160, § 2, 36 Stat. 298 (U. S. Compiled Stats. 1918, § 8618); Railway Co. v. Rigsby, 241 U. S. 33, 36 Sup. Ct. 482, 37 L. Ed. 874.

That, independent of the above, the evidence amply warranted the conclusion of liability, because it was a reasonable inference for the jury that, after the handhold of the car from which plaintiff fell became insecure, the defect, however arising, would, by ordinary care of the defendant, in a reasonable inspection, have been discovered in time to avoid the injury, see Thompson v. Railway Co., 48 Tex. Civ. App. 284, 106 S. W. 910; Railway Co. v. Corrigan, 81 S. W. 554; Labatt's Master & Servant (2d Ed.) vol. 3, § 1024, p. 2713, "Where knowledge is essential to charge the master negligent, ignorance is equivalent to knowledge"; section 1028, p. 2725, showing that negligence is imputable to the master either for "having failed to ascertain the existence of abnormal conditions, or in having omitted, after discovering them, to take such steps as

might be appropriate for the protection of his servants—this principle is applicable where the abnormal conditions resulted from the act of a stranger"; section 1032, p. 2731, "How long a defect must have existed before a master can be charged with knowledge of it is primarily a question of fact for the jury"; section 1056, p. 2791, "If the agent employed to inspect and repair an instrumentality fails to perform the work properly and defects still remain which would have been discovered by a proper inspection, the employer is liable for any injury which may afterwards be caused by those defects"; section 1062, p. 2812, "Negligence is inferable where the inspectors * * * are not sufficient in number" (citing Railway Co. v. Conry, 68 Ill. 561); section 1063, p. 2813, "The character of the inspection * * * must be such as a person of ordinary prudence would have made under the circumstances; the question * * * is primarily one for the jury; this principle is not affected by the fact that the preponderance of the testimony, whether measured by the number of the witnesses, or the comparative strength which the court may think to be due to each, is in favor of one litigant"; section 1063, p. 2815–16, notes, "A loose bolt or screw on one end of a handhold of a railroad car is a defect which could have been discovered by an inspection conducted with ordinary care" (citing Brann v. Railway Co., 53 Iowa, 595, 6 N. W. 5, 36 Am. Rep. 243); also, "A railroad company is liable for an accident * * * caused by the absence of a nut from the top of a brake staff which held the lever fast to it, notwithstanding an imperfect inspection made a short time before the injury" (citing Hayden v. Platt, 84 Hun, 487, 32 N. Y. Supp. 1144); also, "Merely walking around a car is not a sufficient test of a side ladder" (citing Kiley v. Railway Co., 80 Vt. 536, 68 Atl. 713, 13 Ann. Cas. 269); also, "The grabiron of a freight car must be tested by throwing some weight on it" (citing Felton v. Bullard, 37 C. C. A. 1, 94 Fed. 781).

That, as held by this court, in consonance with the doctrine of all the higher courts of Texas, the appellate court has nothing to do with the preponderance of the evidence, and can interfere with the jury's verdict only when it has no evidence for its support, or where the evidence is so overwhelmingly against the verdict as to show it clearly wrong, inferably as having been actuated by passion, prejudice, or other improper motive, see Baker v. Grace, 213 S. W. 299, per the Chief Justice, and Angeline Lumber Co. v. Mast, 208 S. W. 360, per Mr. Justice Brooke.

See, also, Railway Co. v. Rowell, 45 S. W. 766, 767, error refused; Railway Co. v. Holland, 27 Tex. Civ. App. 397, 66 S. W. 68, 69; Railway Co. v. Lee, 69 Tex. 556, 560, 7 S. W. 324; 11 Ency. Pl. & Pr. p. 342.

The testimony of Heard, of Campbell and Boswell, directly that of Heard, shows that plaintiff, when hurt, was to the north of Hamilton street, between it and Chenevert; thence, too, he came, after the accident, calling to Heard for help, holding the arm of his mangled and lost hand. The plaintiff necessarily fell from a car on which the handhold was entirely gone; it was on the ground where he fell. The only one of the two defective cars testified about by the experts from which the handhold was entirely gone was the Sante Fé car. Now, if the testimony of Vallee and Fowler, corroborated by that of Manker, all defendant's witnesses, is accepted, the Santa Fé car, the one with the handhold entirely off, was near the head of the train, about three cars from the engine, and, what is directly to point, to the south of Hamilton street, when the train started, moving south. Taking this testimony together, it is impossible that plaintiff was injured from either of the two defective cars above mentioned—not from the C., B. & Q., because no handhold was entirely gone from it, and not from the Santa Fé, because plaintiff was injured from a car that was north of Hamilton street when the train was standing still, before moving south, while the Santa Fé car was then south of such street. Cogent considerations strengthen this view of the evidence. Campbell's recollection was that the handhold which pulled out with him was at or above midway of the car, while Cleaver testified the missing handhold on the Santa Fé car was the second handhold from the bottom. Campbell's recollection was that he had mounted the ladder at the rear end of the car, from which he fell, while testimony of defendant showed that the defect on the ladder of the Santa Fé car was at the front end of the car. The discrepancy in the number of cars probably on the three House tracks and the number that underwent inspection at the South yards the night of the accident is significant. It indicates that all of the cars of the House tracks may not have been in the string that was at that time there inspected. The House tracks hold over 60 cars; only one trip was made, they say, to the South yards; and one eyewitness (Beale) put the number of cars there inspected on the occasion in question at 12 to 14, and those testifying to a higher number, only 22 to 30 (Manker), and 25 to 28 (Vallee & Fowler). It was a legitimate inference for the jury that plaintiff was injured in the ordinary course from an insecure handhold of a car other than the two defective cars testified about by the experts.

If, however, plaintiff had fallen from the defective Santa Fé car in question, we submit the result would be the same, because the jury had the right, under the evidence, to repudiate the claim that either of the two

defective cars testified about had been tampered with by any third person. At the threshold, there was no evidence of any motive of a third party to have done such an act, nor was there any evidence of opportunity for any one to have committed such an act without detection. Affirmatively the absence of such opportunity, for the entire day before the accident, and to a point before the inspection, was demonstrably established, with the system of watchmen in vogue, day and night. Taking these facts, forceful on the balancing of probability, in connection with the cogent evidence, running through the testimony of the witnesses, that the injury to the handholds might have been done, and according to one witness nine-tenths of it is done, by the cornering or collision or misuse of the cars, which the testimony shows might have extended only to the handholds, and we submit it as indubitable that it was within the province of the jury to find that the injury to the two cars testified about was not the willful act of a third party, but injuries that had happened in the course of the business. This view would find support in the circumstances of the insufficient method of inspection, to which we shall advert, and in the fact that every reason the experts gave for their opinion that the defects in the cars were due to the willful act of a third person was met by testimony, from defendant's own witnesses, making such reasons entirely consistent with the opposite conclusion. For example, there is testimony that the wrench marks might have come from repair work, and that a defective nut, worn in its grooves enough to come off, might do so without stripping the threads of the bolt, leaving the same bright, with rust beyond the covering. Thus, with the entire foundation swept from under the opinions of the experts, the jury were certainly not bound to accept those opinions. "The jury were not compelled to credit all the testimony of any witness or reject it all." Houston & Texas Central R. Co. v. Taylor, 20 Tex. Civ. App. 654, 49 S. W. 1055. They "could have accepted as true a portion of the testimony of each or either of them, rejecting the remainder, in order to base their verdict upon what they believed to be the real facts." Garcia v. Sanders, 90 Tex. 109, 37 S. W. 317. "The jury may act against the greater number of opinions, and in favor of the fewer; for the opinion of one expert may, on account of his greater knowledge and experience on the subject, or from his giving fuller details of the case, or more probable reasons for his opinion, be of greater value to the jury than the opposite opinions of several." Lawson's Ex. & Op. Ev. (2d Ed.) p. 177.

If the plaintiff fell from the Santa Fé car, and if the defect of its handhold was due to the willful act of some third party, still the result must be the same, as concerns liability.

The testimony of Campbell, coupled with that of Heard, and with the trend of other testimony, makes it perfectly clear that the cars, if tampered with, were molested before they reached the House tracks the night before the accident. It is undisputed that they were at that time located on the House tracks, and that they remained there the whole of the next day, being loaded, and that in the early part of the night of that day plaintiff was injured.

The testimony of Campbell and Heard, besides the other testimony, shows that without dispute there were watchmen at those House tracks day and night, to detect and prevent depredation on the property of any sort, and that it was practically impossible for the cars to have been tampered with during the day of their loading on the House tracks. Other watchmen preceded plaintiff during the day until the time he was injured, and testified positively that no one could or did tamper with the cars during that period of his service. It is thence demonstrable that whatever the condition of the cars, and however arising, such condition existed during the time they were being inspected there on that day, and that hence the defects in them, if discoverable by reasonable inspection, ought to have been discovered and remedied, or injury from them otherwise avoided.

Neither the statute of Texas nor that of the United States, requiring the handhold to be secure, limits its benefit to a technical employé, and we submit that as the plaintiff was, without dispute, an invitee upon the premises of the defendant, and where he had a lawful right to be in ascending the ladder, and in doing so was in the ordinary course of his service in furtherance of the railroad business of the defendant, he was entitled to the benefit of the statutes, just as an employé strictly would have been; hence that, regardless of negligence, the insecurity of the handhold, resulting in his injury, of itself entitled him to recover from the evidence, at least if the jury found, as we have seen they might have done, that the defect was not due to the willful act of a third person, either for the reason that car from which plaintiff fell was not one of the two testified about, or for the reason that it was more probable the injuries to the two cars testified about had occurred in the course of the business than that they came from the malicious acts of unknown persons. The state and federal cases making the duty, under the statutes noticed, an absolute one to maintain secure handholds, whether the cars are foreign or domestic, are very clear and to the point, those cited above being deemed sufficient.

If, however, we lay aside the statutes en-

tirely, and rest the case upon the common-law duty of exercising ordinary care in reasonable inspection, the evidence is clear and certain in plaintiff's favor, regardless of whether the defect arose in the course of the business or from the malicious act of a third person: (a) Because negligence was inferable from the defendant having an insufficient number of inspectors—one where two were customary and necessary; and (b) from the insufficient inspection done by the inspector, merely looking the cars over, and not taking hold of the handholds or applying any strength to them to test their efficiency.

The authorities cited (Thompson v. Railway Co., 48 Tex. Civ. App. 284, 106 S. W. 910, and Railway Co. v. Corrigan, 81 S. W. 554, and Labatt's Master and Servant [2d Ed.] vol. 3, § 1028, p. 2725) are directly in point in affirming the duty of cars required, and the immateriality of the fact that the car may have been a foreign one, or of the fact, if a fact, that the defect arose from the malicious act of a third party, provided due diligence would have discovered the defect and avoided the injury. The other citations and excerpts from Labatt's Master & Servant are submitted as covering every phase of this case, in law or in fact, and as demonstrating the safe anchorage of the verdict and judgment of the court below.

Review of the adversely cited authorities for distinguishment will be unnecessary, as they are not opposing, fitting as they do, entirely different facts; indeed, it is safe to affirm that no respectable authority can be produced to deny to the jury a finding of liability where, as here, the defect, easily discoverable by a simple, ordinary test, on proper inspection, had existed throughout a full inspection day, and probably, almost certainly, would have been discovered if there had been, as there was not, a sufficient inspection method by a sufficient inspection force.

Finding no error in the trial of this cause, the judgment of the trial court is in all things affirmed.

HIGHTOWER, C. J., and WALKER, J. [1, 2] While we do not agree with Justice BROOKE in all that is said by him in the foregoing opinion in reaching his conclusion that the judgment in this case should be affirmed, we do agree with the result reached. We are of the opinion that the evidence as a whole made it an issue of fact for the determination of the jury as to whether the handhold on the car which appellee claims came loose and caused his injury was insecure and insufficient for the use for which it was intended, and that such condition of the handhold was due to negligence imputable to the defendant, and that such negligence was a proximate cause of appellee's injury.